935 So.2d 239 (2006)
Newell H. ANDRY, Tammy L. Cummins, Charlie Young, Wynde Charrier Saddy, Warren Campagna, Barbara Talcott and Armand & Catherine Duvio d/b/a Palace Day Camp
v.
MURPHY OIL, U.S.A., INC., Louisiana Power & Light Company, and Ernest Cagle.
Anthony S. Annino, et al.,
v.
Murphy Exploration and Production Company, Murphy Oil USA, Inc., Walworth Company and Louisiana Power & Light Company.
John Polizzi, Mary C. Polizzi, Larry Polizzi, Jason C. Polizzi and Johnnie Thomas,
v.
Murphy Exploration and Production Company and Murphy Oil USA, Inc.
Carrie Deffes, et al.,
v.
Murphy Oil USA, Inc.
Willie Washington, et al.,
v.
Walworth Company, Louisiana Power and Light, et al.
Insurance Company of North America, Reliance National Insurance Company, Zurich Insurance Company and National Union Fire Insurance Company of Pittsburg, Pennsylvania,
v.
Louisiana Power & Light Company and Walworth Company.
Michael Robert McCullogh,
v.
Murphy Oil, U.S.A., Inc., Entergy Louisiana, Inc., and Ernest Cagle.
Bryan Cassagne, Kary Cassagne, Michelle Cassagne and Brooke Cassagne,
v.
Entergy Louisiana, Inc., Formerly Known as Louisiana Power & Light Company and Walworth Company.
Nos. 2005-CA-0126 to 2005-CA-0133.
Court of Appeal of Louisiana, Fourth Circuit.
June 14, 2006.
Rehearing Denied August 15, 2006.
*241 Kenneth P. Carter, and Eugene G. Taggart, Terrence G. O'Brien, John J. Zvonek, Taggart Morton Ogden Staub Rougelot & O'Brien, LLC, New Orleans, LA, for Entergy Louisiana, Inc. (Formerly Known as Louisiana Power & Light Company).
Charles W. Schmidt III, Mary Beth Meyer, Christopher J. Alfieri, Christovich & Kearney, L.L.P., New Orleans, LA, and Robin G. Weaver, Squire, Sanders & Dempsey, L.L.P., Cleveland, OH, for Atlantic Richfield Company.
George A. Frilot, III, Joseph N. Mole, Allen J. Krouse, III, Amanda L.C. Bradley, *242 Frilot, Partridge, Kohnke & Clements, New Orleans, LA, and Daniel L. Dysart, Dysart & Tabary, L.L.P., Chalmette, LA, for Murphy Oil U.S.A., Inc.
Michael J. Deblanc, Jr., Preis, Kraft & Roy, New Orleans, LA, for Murphy's Insurers, Insurance Company of North America, Reliance National Insurance Company, Zurich Insurance Company and National Union Fire Insurance Company of Pittsburgh, PA.
Kenny M. Charbonnet, Charbonnet Law Firm, L.L.C., Metairie, LA, and James S. Rees, III, Law Offices of James S. Rees III, Covington, LA, for Willie Washington.
Paul D. Palermo, Spyridon, Koch, Palermo & Dornan, L.L.C., Metairie, LA, for Bryan Cassagne, Kary Cassagne, Michelle Cassagne and Brooke Cassagne.
(Court Composed of Judge PATRICIA RIVET MURRAY, Judge MAX N. TOBIAS Jr., Judge EDWIN A. LOMBARD).
MAX N. TOBIAS, Jr., Judge.
These consolidated matters arise out of an explosion and resulting fire at the Residual Oil Supercritical Extraction ("ROSE") heater located within an oil refinery owned by Murphy Oil U.S.A., Inc. ("Murphy") in its Meraux, Louisiana facility. After reviewing the facts and applicable law, we amend the judgment of the trial court and affirm the judgment as amended.[1]
On 27 July 1995 at approximately 1:50 a.m., lightning struck an electric distribution line owned by Murphy and located at the refinery's Mississippi River dock. The lightning strike placed the refinery in an "upset" condition due to the resultant power interruption in the refinery's critical utility systems. After the lightning fault cleared, a closing relay designed by Louisiana Power & Light Company ("LP & L"), (now known as "Entergy Louisiana, Inc.," and referred to hereinafter as "Entergy") on Feeder One failed to automatically close.[2] The failure shut down all the electrical loads connected to that feeder and activated under-voltage protective relays on process units, cooling water pumps, fans, and other critical utility systems. Entergy reclosed the breaker by remote control at 2:08 a.m. from its Distribution Dispatch Center in Gretna, Louisiana after the fault in the refinery circuit was cleared. Meanwhile, Murphy had to put the ROSE unit on "hot stand-by," a safe operating condition that keeps the unit *243 warm and ready to receive process electrical feed when conditions return to normal.
At approximately 7:00 a.m. that morning, Entergy technicians were sent to the substation to investigate the failure of the automatic recloser on Breaker W7112. To do this, the Entergy crew had to reroute electricity within the substation from the operating bus to the bypass bus. At 8:52 a.m., Switch 7212, which allowed electric power to flow through breaker W7116, was mistakenly opened while under load by one of Entergy's servicemen. Electrical arching and a flashover occurred in the substation causing injury to the serviceman and damage to Switch 7212. It also knocked out all power to Feeder One and caused a severe voltage dip on other feeders, including the one that served the ROSE unit. Murphy was not notified that work would be performed before the technicians arrived that morning.[3]
Normally the ROSE unit receives asphalt-type material from the VAC unit, exposes it to radiant heat, and mixes it with a solvent, pentane, under high pressure to extract deasphalted oil ("DAO"), resin, and asphaltene. Once separated, the DAO, resin, and asphaltene flow into separate strippers that remove pentane. The pentane is then cooled with overhead fin fans, condensed, and recirculated back into the ROSE unit. Pressure differentials are the primary safety device that prevents reverse flow of pentane through the main system.
The low voltage at 8:52 a.m. caused losses in steam pressure and triggered under-voltage relays and other automatic protective devices. These, in turn, shut down process units, most refinery motors, and the ISOPAK air compressor. Loss of the ISOPAK air compressor caused instrument air system pressure to drop below normal settings. Protective relays tripped the 480-volt ("480v") ROSE unit switchgear main breaker that powered the ROSE unit pumps and fans, including the unit's pentane cooling/condensing fans. At some point, the flame in the ROSE heater was extinguished.
At 9:07 a.m. Murphy electricians reset the 480v main breaker, but Murphy operators did not restart the cooling fans on the DAO stripper. Murphy restored power to Feeder One at 9:10 a.m. and then began the restart process of the ROSE heater by purging the heater with steam. At 9:33 a.m. Murphy employees attempted to relight the ROSE heater, but it exploded and caught fire. After the explosion, it was determined that a defective swing check valve installed in the DAO line at the refinery malfunctioned and improperly allowed flammable pentane gas to backflow into a steam line that Murphy used to purge the ROSE heater during the relighting process. The Walworth Company ("TWC") manufactured the valve.[4]
Several lawsuits resulted from the incident. On the afternoon of the explosion and fire, refinery neighbors filed the first of several class action lawsuits against Murphy. On 25 September 1996, the trial court certified a class consisting of persons who claimed to have sustained damages as a result of the event and the separate actions were consolidated. Shortly before trial in July 2002, Murphy settled the class claims for $8.8 million after the trial court *244 held a fairness hearing. Murphy funded $7.3 million of the settlement, while the insurers of the bankrupt TWC paid the balance. As part of the settlement, Murphy received an assignment of the plaintiffs' claims.
After the class action lawsuit was filed, Murphy filed a cross-claim against Entergy and a third-party petition against TWC, as manufacturer of the swing check valve. Later in the litigation, Murphy amended its third-party petition to assert claims against Arilan, S.A. de C.V. ("Arilan"), the parent company of TWC; Arilan's majority shareholder, Empresas Lanzagorta, S.A. de C.V. ("Lanzagorta"); and the former indirect minority shareholder of Arilan, Atlantic Richfield Company ("ARCO").
A bench trial was held from 22 September to 12 November 2003. After considering the evidence and the parties' post-trial briefs, the trial court rendered judgment on 21 July 2004, finding Entergy 40% at fault, TWC 40% at fault, and Murphy 20% at fault. In its reasons for judgment, the court found that the fault of these parties contributed to the event and that each was a legal cause and was legally responsible for the resulting damages. The court also found that Murphy did not meet its burden of proof required to prevail against ARCO. Although at fault, TWC was not cast in judgment because it had received a release from liability as a result of the settlement with regard to the class action plaintiffs.
The trial court found Murphy liable because it used the swing check valve manufactured by TWC in a vertical position and further held that the purging and relighting efforts of Murphy's employees of the ROSE heater during the two relighting attempts were not reasonable under the conditions present on the day of the accident.
The trial court also found Entergy at fault under tort and breach of contract theories. The trial court stated:
Their Delictual [sic] responsibility arises out of events occurring after the initial power outage at the refinery. The first power outage was due to a lightning strike at the refinery. This outage placed the refinery in an "upset" condition due to power interruption in the refinery's critical utility systems. While the refinery was attempting to recover from this "upset," employees of LP & L sent a repair crew to the refinery. Murphy was not notified of their presence at the Meraux substation (which is located on Murphy's site). While there, LP & L employees made a switching error resulting in an electrical arc, which in turn caused another power outage further exacerbating conditions at the refinery. This arc also resulted in injury to an LP & L employee. While the injured employee was being attended to, Murphy was unable to conduct "in-plant" switching to restore power to critical components of the refinery. This caused further delay and "upset."
The outages caused the problems to several components of the refinery. This included the ROSE heater losing its flame and the cooling fans for the DAO stripper stopped. The loss of cooling fans caused an over pressure condition thereby forcing Pentane into the refinery's steam lines. Steam is used to purge the ROSE heater before a relight of its flame. Pentane contaminated steam was released into the ROSE heater during Murphy's attempt to purge the heater before a relight attempt. The ROSE heater exploded and caught fire during the second relight attempt by Murphy employees. Without the electrical outage caused by the negligence of LP & L, the flame on the ROSE heater would not have gone out *245 and there would have been no need to attempt the relight. The cooling fans on the DAO stripper would not have shut down. There would have been no over pressure condition in the DAO stripper with the resulting hydrocarbon flow into the steam lines. While the first outage was not due to fault on the part of LP & L, the actions taken thereafter directly led and contributed to the explosion in the ROSE heater.
LP & L's contractual liability results from its breach of its contract with Murphy to "use reasonable diligence to provide safe, adequate and continuous service." Evidence presented at trial adequately supported Murphy's position that LP & L had a poor record of reliability over the years preceding the July 27, 1995, explosion and fire with regard to the transmission and distribution of electricity to the refinery. Failure to provide adequate and continuous service was a breach of the contract between them.
Both Murphy and Entergy have appealed from the judgment.
Murphy's appeal addresses the trial court's dismissal of its claims against ARCO. These claims were initially based on the Louisiana Products Liability Act, La. R.S. 9:2800.52, et seq. ("LPLA"); later Murphy amended its claim to assert alternative claims against ARCO under the Louisiana Unfair Trade Practices and Consumer Protection Law, La. R.S. 51:1401, et seq. ("La. UTP-CPL"). The trial court granted ARCO's partial exception of no cause of action and dismissed Murphy's La. UTP-CPL claims. Both this court and the Supreme Court denied Murphy's writ applications on the issue.[5] After a second attempt to amend its third-party petition, which was denied by the trial court, Murphy filed another supervisory writ application with this court. Again, this court denied relief to Murphy.[6]
Murphy's claim against ARCO is based on the following facts. Walworth Company was a manufacturer of industrial valves for more than 160 years. In the 1960s, Walworth Company began to out-source the production of valves through an Italian company known as WAGI. The valves were made to Walworth Company's specifications for sale in the United States, and were clearly identified as having been made in Italy under license from Walworth Company.
In October 1975, The Anaconda Company ("Anaconda") acquired the Walworth trademark and manufacturing assets from I.U. International, Inc. ARCO acquired Anaconda's stock in January 1977, thereby making Anaconda its wholly-owned subsidiary. Walworth Company continued as a wholly-owned subsidiary of Anaconda. When ARCO examined Anaconda's business holdings, it determined that Walworth Company did not fit into ARCO's business operations or strategic plans and decided to divest itself of Walworth Company.
A Mexican conglomerate, Lanzagorta, was found as a buyer for Walworth Company. While the plan was to sell Walworth Company outright, Lanzagorta did not have sufficient capital at that time to acquire the entire company. Thus, Lanzagorta and Anaconda created a new corporation what would hold the assets of Walworth Company. This company would be owned, in turn, by a corporation whose *246 shares would be 60% owned by Lanzagorta and 40% indirectly by Anaconda.
Lanzagorta, Walworth Company, and Anaconda entered into an agreement to effectuate the sale of 60% of Walworth Company stock to Lanzagorta in June 1979, in a document titled "Joint Venture Agreement" ("the Agreement"), but the parties did not enter into a typical joint venture. Instead, the agreement was to form a new company named TWC to own and operate the assets of Walworth Company. Pursuant to the agreement, the former Walworth Company, which conveyed its assets to TWC, would cease its involvement in the business of manufacturing valves in August 1979, and change its name to Anaconda Valve Company. The new company's sole business was to administer the retained pension liabilities accrued during Walworth Company's existence. At no time did ARCO or any of its subsidiaries do business as TWC.
Pursuant to the Agreement, the assets of the former Walworth Company were transferred to TWC. Anaconda also contributed $12.7 million in cash to TWC. Lanzagorta contributed five valve companies to Arilan, the holding company which was to own all voting stock of TWC.
The culmination of these corporate transactions resulted in the creation of TWC, which began business on 14 August 1979. The stock ownership interests were:
1. Arilan owned 100% of TWC voting stock.
2. Lanzagorta owned 60% of Arilan voting stock.
3. Casolin S.A owned the remaining 40% of Arilan voting stock.
4. Anaconda Valve owned 100% of Casolin S.A. stock.
5. Anaconda owned 100% of Anaconda Valve Company stock.
6. 100% of Anaconda stock was owned by ARCO.
7. 60% of non-voting preferred stock of TWC was owned by Lanzagorta and 40% by Anaconda Valve Company.
A provision of the Agreement required Lanzagorta to purchase the remaining 40% of Arilan within five years, which was done on 28 December 1984, when Pedro Lanzagorta purchased the 40% of Arilan stock owned by Anaconda Valve Company's subsidiary, Casolin, S.A. That sale terminated ARCO's indirect minority interest in the voting stock of Arilan. Two years later, Anaconda Valve Company sold its non-voting preferred shares in TWC to Jose Lanzagorta, thereby terminating ARCO's entire indirect interest in TWC.
The evidence reveals that at all relevant times, TWC operated as a duly and separately organized corporation. It maintained all appropriate corporate formalities: the Board of Directors of TWC met regularly and minutes were maintained. TWC had its own lending relationships and bank accounts through which its separate business was performed. It also had its own insurance coverage to protect its operations.
The trial court held that Murphy did not meet the burden of proof required to prevail on its claims against ARCO and insufficient evidence existed to warrant piercing ARCO's corporate veil. Murphy has appealed from this portion of the judgment, setting forth the following assignments of error:
1. Whether or not Anaconda/ARCO was a "manufacturer" under the LPLA, it was clearly wrong for the trial court to fail to hold Anaconda/ARCO liable to Murphy for Anaconda/ARCO's independent fraudulent and illegal conduct that directly contributed to the explosion and fire.

*247 2. It was an error of law for the trial court to hold that (a) this case was governed solely by the LPLA; (b) piercing the corporate veil of "TWC" was a necessary predicate to Murphy's recovery from ARCO; and (c) if Anaconda/ARCO was not a "manufacturer" under the LPLA, in denying Murphy's right to assert alternative claims under the La. UTP-CPL and/or Civ.Code art. 2315 against Anaconda/ARCO for its own fraud, deceit, and misrepresentation.
3. The record in the trial court demonstrates that it was manifest error for the trial court to assign 20% comparative fault to Murphy. After correctly assigning 40% comparative fault to Entergy, the record demonstrates that it was manifest error not to have assigned more than 40% of the comparative fault to Anaconda/ARCO rather than to the previously released party, TWC.
Because the decision of the trial court was based upon its evaluation and interpretation of the facts presented by Murphy and ARCO, we apply the manifest error-clearly wrong standard of review. This standard of review also applies to the allocation of fault among comparatively negligent parties. Petre v. State ex rel. Department of Transp. and Development, 01-0876, p. 13 (La.4/3/02), 817 So.2d 1107, 1114-15.
Murphy claims that ARCO is liable because of a design change in the valve and its subsequent labeling. Murphy maintains that the valve involved in the refinery explosion was manufactured in Italy by WAGI and distributed for sale in the United States by TWC. This model, known as a 5341F check swing valve, had been originally designed so that, without modification, it could be used in both horizontal and vertical lines. Murphy maintains that in 1977, WAGI changed the design of the check valve so that it was suitable for use only in a horizontal line. Notice of the design change was allegedly given to Norm Schoenfeld, then President of Walworth Company and a vice president of Anaconda, at a time after ARCO had acquired Anaconda.[7] Despite the design change, Murphy claims that catalogs published by TWC continued to warrant that the valve in question could be used either vertically or horizontally.
Whether Murphy relied on a catalog before purchasing the valve in question is of no moment. Murphy filed into the record a copy of a page from a 1972 catalog, five years before the WAGI design change, as well as three years before Anaconda acquired the Walworth Company assets from I.U. International, Inc. Murphy also filed in evidence a 1989 catalog, published three years after ARCO's entire indirect interest in TWC was terminated and seven years after the valve in question was installed in the ROSE heater.[8]
*248 Murphy next contends that Anaconda and TWC intentionally mislabeled the WAGI valves in order to mislead customers. We find no evidence to support this argument.
The label adopted by TWC in 1980 was intended for use on valves that were produced in its newly-opened Houston facility. Although a label with the new wording was placed on the WAGI-made valve TWC sold to Murphy two years later, Murphy did not introduce evidence that would establish that Anaconda approved using the new label on fully assembled WAGI valves or authorized the removal of any WAGI labels.
In October 1980, it was anticipated that TWC would be assembling valves in its Houston facility made primarily with parts and components produced by Mexican companies. Thus, TWC obtained legal advice to insure that the tags complied with the laws of the United States. Although the original tag for valves being assembled and tested in Houston read, "[m]ade in USA by The Walworth Company, Houston, with U.S. and imported parts," legal counsel determined that the tags needed to be changed. Thus, the new tags read: "The Walworth Company, Houston, Texas  Made with U.S. and Imported Components." These tags were used on TWC's existing inventory, as well as new valves. The tags were not to be placed on imported, finished valves manufactured by WAGI, which were stored in bonded warehouses upon arrival in the U.S.
In 1982, during the course of a refinery expansion project, Murphy's construction contractor ordered a Walworth 5341F swing check valve from an authorized distributor of TWC in Baton Rouge. The purchase order specified that the valve was to be "new and of domestic origin." The valve delivered to Murphy was installed in a vertical steam line in the ROSE unit and bore a tag reading: "The Walworth Company, Houston, Texas  Made with U.S. and Imported Components." Remnants of the original WAGI "Made in Italy" tag were found underneath the replacement tag after the accident at issue in this case. Despite the mislabeling of the valve in question, we find no evidence of Anaconda's (or ARCO's) knowledge of or participation in the re-labeling.
Murphy argues that three legal bases exist under which ARCO is directly liable to it. The first is that a manufacturer under the LPLA is liable, thus absolving Murphy of having to pierce ARCO's corporate veil in order to impose liability.
The LPLA establishes the exclusive theories of liability for manufacturers for damage caused by their products. Pursuant to La. R.S. 9:2800.53, a manufacturer is defined as follows:
(1) "Manufacturer" means a person or entity who is in the business of manufacturing a product for placement into trade or commerce. "Manufacturing a product" means producing, making, fabricating, constructing, designing, remanufacturing, reconditioning or refurbishing a product. "Manufacturer" also means:
(a) A person or entity who labels a product as his own or who otherwise holds himself out to be the manufacturer of the product.
(b) A seller of a product who exercises control over or influences a characteristic of the design, construction or quality of the product that causes damage.
* * *
(d) A seller of a product of an alien manufacturer if the seller is in the *249 business of importing or distributing the product for resale and the seller is the alter ego of the alien manufacturer. The court shall take into consideration the following in determining whether the seller is the alien manufacturer's alter ego: whether the seller is affiliated with the alien manufacturer by way of common ownership or control; whether the seller assumes or administers product warranty obligations of the alien manufacturer; whether the seller prepares or modifies the product for distribution; or any other relevant evidence. A "product of an alien manufacturer" is a product that is manufactured outside the United States by a manufacturer who is a citizen of another country or who is organized under the laws of another country.
* * *
Based on the evidence in the record, we find that only TWC can be defined as a manufacturer under the LPLA. The fact that the valve was apparently manufactured in Italy by WAGI does not contradict the trial court's finding that TWC was the manufacturer under the statute. TWC was the importer of a product made by an "alien" manufacturer and sold the valves as its own, as evidenced by the label placed on them. Pursuant to paragraph (1)(d) above, we agree with the trial court and find Murphy's argument without merit.
Murphy argues, however, that Anaconda/ARCO can also be considered a "manufacturer" of the valve under La. R.S. 9:2800.53(1)(b) and/or (d) quoted above because WAGI gave notice of the valve's design change to Norm Schoenfeld in November 1977, who was then president of Walworth Company and also a vice-president of Anaconda/ARCO. However, the only case cited by Murphy, Cook v. United Container Machinery Co., 98-120 (La.App. 5 Cir. 5/27/98), 712 So.2d 307, does not support its argument.
In Cook, the plaintiff was injured while operating a F & E printing press allegedly manufactured by the Flynn and Emrich Company and The Ward Die-Vise Company, a predecessor to Ward Machinery Company. Ward denied it was the manufacturer of the press and, therefore, claimed it could not be held liable under the LPLA and filed a motion for summary judgment, which was granted by the trial court. On appeal, the plaintiff referred to letters between Ward, its predecessor, and F & E showing that the companies worked together designing the printers. In addition, documents indicated that Mr. Ward of Ward Machinery assisted in the original design of the F & E printer. The defendant contended that Mr. Ward's role, if any, was as an employee of F & E. In response, the plaintiff argued that a genuine issue of fact existed as to Mr. Ward's role in designing the printer because if the Ward Company, through Mr. Ward, helped design the printer, then it would also be deemed a manufacturer under the LPLA. The court agreed, but because the record did not identify Mr. Ward's role, the court found summary judgment unwarranted. Id. at p. 4, 712 So.2d at 309.
In the instant case, neither Anaconda nor ARCO helped design the swing check valve, although under Murphy's theory they may have known about the design change. Under the LPLA, therefore, they are not manufacturers of the valve and cannot be liable under the statute.
We also reject the argument that ARCO can be held liable under the facts presented pursuant to La. C.C. art. 2315 for its own independent negligence. As acknowledged by Murphy, Louisiana law does not permit a court to hold the parent company liable for it subsidiary's actions *250 without proof that the parent company knew of and approved those actions. As stated by the United States Supreme Court in United States v. Bestfoods, 524 U.S. 51, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998)
It is a general principle of corporate law deeply "ingrained in our economic and legal systems" that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries. Douglas Shanks, Insulation from Liability Through Subsidiary Corporations, 39 Yale L.J. 193 (1929) (hereinafter Douglas); see also, e.g., Buechner v. Farbenfabriken Bayer Aktiengesellschaft, 38 Del.Ch. 490, 494, 154 A.2d 684, 687 (1959); Berkey v. Third Ave. R. Co., 244 N.Y. 84, 85, 155 N.E. 58 (1926) (Cardozo, J.); 1 W. Fletcher, Cyclopedia of Law of Private Corporations 33, p. 568 (rev. ed. 1990) ("Neither does the mere fact that there exists a parent-subsidiary relationship between two corporations make the one liable for the torts of its affiliate"); Horton, Liability of Corporation for Torts of Subsidiary, 7 A.L.R.3d 1343, 1349 (1966) ("Ordinarily, a corporation which chooses to facilitate the operation of its business by employment of another corporation as a subsidiary will not be penalized by a judicial determination of liability for the legal obligations of the subsidiary"); cf. Anderson v. Abbott, 321 U.S. 349, 362, 64 S.Ct. 531, 537, 88 L.Ed. 793 (1944) ("Limited liability is the rule, not the exception"); Burnet v. Clark, 287 U.S. 410, 415, 53 S.Ct. 207, 208, 77 L.Ed. 397 (1932) ("A corporation and its stockholders are generally to be treated as separate entities"). Thus it is hornbook law that "the exercise of the `control' which stock ownership gives to the stockholders will not create liability beyond the assets of the subsidiary. That `control' includes the election of directors, the making of by-laws and the doing of all other acts incident to the legal status of stockholders. Nor will a duplication of some or all of the directors or executive officers be fatal." Douglas 196 (footnotes omitted).
Id. at 61-62, 118 S.Ct. at 1884.
Therefore, we find this assignment of error to be without merit.
We further agree with the trial court that Murphy has not presented the requisite evidence to pierce the corporate veil in order to hold ARCO liable for the negligence, if any, of either Anaconda or TWC. The Louisiana Supreme Court addressed the issue in Riggins v. Dixie Shoring Co., Inc., 590 So.2d 1164, 1167-68 (La. 1991):
The general rule that corporations are distinct legal entities, separate from the individuals who comprise them, and that the shareholders are not liable for the debts of the corporation, is statutory in origin and well supported by the jurisprudence. LSA-R.S. 12:93(B); La.C.C. arts. 435, 436, 437; Buckeye Cotton Oil Company v. Amrhein, 168 La. 139, 121 So. 602 (La.1929); Johnson v. Kinchen, 160 So.2d 296 (La.App. 1st Cir.1964). The economic purpose underlying this framework of limited liability was expressed by the First Circuit over a quarter century ago: "[P]rotection from individual liability encourages and promotes business and industry" Id. at 299. Additionally, this shareholder liability shield encourages business investments in high-risk areas by enabling investors who utilize the corporate form to make capital contributions to corporations while insulating their personal wealth from the risks inherent in business. Smith v. Cotton's Fleet Service, Inc., 500 So.2d 759 (La.1987); Glazer v. Commission *251 on Ethics for Public Employees, 431 So.2d 752 (La.1983); Johnson v. Kinchen, supra; Comment, Piercing the Corporate Veil in Louisiana, 22 Loy. L.Rev. 993, 994 (1976). No matter the size of the business, incorporation is an optional form for conducting business in Louisiana. In fact, the 1968 revision to the corporation laws now allow a single individual to incorporate. LSA-R.S. 12:21.
Because of the beneficial role of the corporate concept, the limited liability attendant to corporate ownership should be disregarded only in exceptional circumstances. Johnson v. Kinchen, supra. Moreover, if the plaintiffs do not allege shareholder fraud, they bear a heavy burden of proving that the shareholders disregarded the corporate entity to such an extent that it ceased to become distinguishable from themselves. Chaney v. Godfrey, 535 So.2d 918 (La. App. 2d Cir.1988); American Bank of Welch v. Smith Aviation, Inc., 433 So.2d 750 (La.App. 3d Cir.1983).
There are limited exceptions to the rule of non-liability of shareholders for the debts of a corporation, where the court may ignore the corporate fiction and hold the individual shareholders liable. Generally, that is done where the corporation is found to be simply the "alter ego" of the shareholder. It usually involves situations where fraud or deceit has been practiced by the shareholder acting through the corporation. LSA-R.S. 12:95; Dillman v. Nobles, 351 So.2d 210 (La.App. 4th Cir.1977); Bossier Millwork Supply Co. v. D.R. Const. Co., Inc., 245 So.2d 414 (La.App. 2d Cir.1971). Another basis for piercing the corporate veil is when the shareholders disregard the requisite corporate formalities to the extent that the corporation ceases to be distinguishable from its shareholders. Gordon v. Baton Rouge Stores Co., 168 La. 248, 121 So. 759 (La.1929); Cahn Elec. Appliance Co. v. Harper, 430 So.2d 143 (La.App. 2d Cir.1983); Dillman v. Nobles, supra; Brown v. Benton Creosoting Co., 147 So.2d 89 (La.App. 2d Cir.1962).
The record on appeal does not disclose grounds for piercing the corporate veil so as to hold ARCO liable for any alleged acts of Anaconda or TWC. All corporate formalities were observed. Further, no evidence exists to support a claim that ARCO was practicing fraud or deceit through Anaconda and subsequently through TWC. These arguments are simply without merit.
Murphy argues that the third legal basis to hold ARCO liable is under the La. UTP-CPL. On more than one occasion we have rejected this argument and, therefore, we apply the law of the case doctrine. As stated in Zatarain v. WDSU-Television, Inc., 95-2600, p. 10 (La.App. 4 Cir. 4/24/96), 673 So.2d 1181, 1186:
This court generally applies the "law of the case" doctrine when reviewing an issue decided on supervisory writs as part of the appeal of the case following a trial on the merits, except when it finds either that the previous decision is based on palpable error or that manifest injustice would result. Sharkey v. Sterling Drug, Inc., 600 So.2d 701, 705 (La.App. 1st Cir.), writs denied, 605 So.2d 1099, 1100 (La.1992).
Because neither of those exceptions is present here, we stand by our prior rulings. Consequently, we affirm the trial court's judgment in favor of ARCO.
Finally, Murphy argues that the trial court erred in assessing it with 20% of the fault for the explosion and fire. The trial court was quite cryptic in its reasons for judgment where Murphy was concerned:

*252 Murphy Oil was at fault in this event. Murphy's liability results from its use of the valve manufactured by the Walworth Company in its refinery in a vertical position. Such liability arises under Civil Code Article 2317. Additionally, under Civil Code Article 2315, Murphy had a duty to insure that the various components in connection with its ROSE heater were suitable for their intended applications. Murphy breached such duty when it used this defective valve in its refinery. Additionally, the purging and relighting efforts of Murphy employees of the ROSE heater during the two relight attempts were not reasonable under the conditions on the day of the event.
Murphy contends that the trial court erred in finding it responsible under La. C.C. arts. 2315 or 2317 because it did what was ordinary and customary to purchase the correct valve and determine through pressure testing that the flapper in the valve would hold pressure. Murphy correctly points out that even TWC did not know the valve was defective for vertical line usage.
Testifying on Murphy's behalf was Andy Warren, a retired engineer, who had worked for the SIP Parsons ("SIP"), the firm that had constructed the refinery expansion project for Murphy in 1982. Before ordering the various valves to be installed in the project, Mr. Warren, the project manager, had been given certain specifications by Murphy. The specifications required that the valves be of domestic origin and purchased from a Louisiana company.
Mr. Warren was shown the purchase order issued to Grant Supply in Baton Rouge for part of the valves that they purchased for the project. Clause 22 of SIP's standard clauses at the end of the purchase order stated that: "Seller shall warrant that all piping materials, piping components and valves furnished on this order shall be new and of domestic origin unless otherwise stated."
Mr. Warren was familiar with Walworth valves and considered them to be of high quality. It was in SIP's files that a page from the 1972 Walworth catalog was found. On that page, the valve in question, the 5341F, was represented as: "Walworth steel swing checks can regularly be used in horizontal or vertical lines." Mr. Warren was not aware of ever buying a steel swing check valve that was not usable in a vertical line.
It was not until months after the accident that the design defect was discovered. The record reflects that the change in design was not readily ascertainable. However, we do not agree with the trial court that Murphy was negligent by installing the valve in a vertical line. Nothing suggests that Murphy could or should have known that the Walworth swing check valve design had been changed. Despite this, however, we find that the trial court properly assigned 20% fault to Murphy for its relighting procedures as explained below.
Although the trial court did not explain how the purging and relighting efforts of Murphy employees of the ROSE heater during the two relight attempts were unreasonable under the conditions existing on 27 July 1995, the record contains evidence supporting this conclusion. For example:
1. Murphy's emergency procedures violated the OSHA requirement of "written operating procedures that provide clear instructions for safety [sic] conducting activities in each covered process." See 29 CFR Part 1910.119(f).

*253 2. Murphy attempted to relight the heater before stabilizing the utility systems.
3. The Murphy Boardman monitoring instrument pressures did not inform those relighting the heater of the conditions of the air, steam, and electricity utilities.
4. Murphy failed to follow its own emergency procedures before attempting to relight the heater.
Based on the evidence in the record, we do not find the trial court's apportionment of fault to Murphy clearly wrong or manifestly erroneous. Consequently, we find the assignment of error without merit.
The second appeal was filed by Entergy, wherein it argues that the trial court erred in assessing it with 40% fault for the explosion and fire. Entergy sets forth four assignments of error:
1. The trial court erred by finding Entergy liable in tort and awarding damages outside the contract;
2. The trial court erred in finding that the switching error was a "cause-in-fact" and a "legal cause" of the explosion and fire in the ROSE heater;
3. The trial court erred in failing to consider the controlling precedent of Perkins v. Entergy Corp., 00-1372, 00-1387, 00-1440 (La.3/23/01), 782 So.2d 606;
4. The trial court erred by awarding damages neither proven not stipulated to by Entergy.
In its first assignment of error, Entergy contends that the contract between it and Murphy constitutes the entire agreement between the parties and that the trial court erred by holding that Entergy owed unspecified tort duties to Murphy that were outside the contract. Because it did not breach the contract, Entergy argues that it cannot be at fault for the explosion and fire.
The contract between Entergy and Murphy was originally executed in 1995 and provides in pertinent part:
The Company [Entergy] shall use reasonable diligence to provide safe, adequate and continuous service but shall not be responsible for loss or damage caused by the failure or other defects of service when such failure is unavoidable or due to unforeseen difficulties or causes beyond its control.
Entergy was obligated to provide to Murphy power and energy of a maximum capacity of 25,000 Kilowatts ("kW"), which amount was later changed to 30,000 kW at approximately 7,960/13,000 Volts. Entergy maintains that at all times on 27 July 1995, even during and immediately after its serviceman's accident, it made such power and energy available to its customer. Entergy argues that Murphy's failure to utilize full contract quantities available was not as a result of any failure by Entergy; instead, it was the result of limitations in the Murphy distribution system.
In response, Murphy maintains that the trial court correctly found that Entergy breached its contractual obligation to provide safe, adequate, and continuous service. In fact, Murphy contends that it had complained to Entergy about frequent power outages/interruptions and met with Entergy the day before the incident to discuss its power failures.
The trial court's finding, that Entergy breached the contract by failing to provide adequate and continuous service, is accorded great deference and cannot be reversed absent manifest error. Murphy presented the testimony of Ernest Cagle, Sr., the Murphy Meraux refinery manager on the date of the accident, who had attended a meeting with Entergy on 26 July 1995. Mr. Cagle testified that the plant was having *254 severe electrical problems in the form of frequent outages that prevented Murphy from running the facility continuously. When he brought that issue up at the meeting, Entergy did not have a response. Arthur Folse, II, Entergy's senior account manager for major accounts, acknowledged that Mr. Cagle brought the problem to his attention during that meeting:
Q: Now, is it fair to say on this date that you in particular were under a lot of pressure from Murphy  in particular, Ernie Cagle  to increase the reliability of the power  electrical power from LP & L to Murphy?
A: I would agree that that was an expressed concern and basically, desired topic of focus between our two companies.
Murphy also elicited testimony from electrical expert, Eli Yagor, who stated in his expert report that the annual rate of outages "is considered unacceptable in the continuous process industries." Conversely, Entergy's electrical expert, Frederick Brooks, testified:
Q: Was power interrupted to the Refinery as a result of the 8:52 Meraux Substation Event?
A: No, sir.
Q: Was continuous power supplied to the Refinery?
A: Yes, it was.
The trial court was presented with conflicting testimony on the breach of contract issue. The trial court found that Entergy had breached the contract between it and Murphy. The appellate record supports its conclusion; we do not find the trial court's finding manifestly erroneous or clearly wrong.
Finally, with regard to the issue of breach of contract, Entergy maintains that Murphy did not show that its damages were foreseeable at the time the contract was made. Entergy relies on La. C.C. art. 1996, which states:
An obligor in good faith is liable only for the damages that were foreseeable at the time the contract was made.
In addition, Entergy points to the contract, which contemplates that service may be suspended without notice "for repairs in [LP & L's] service facilities" or "on the discovery of conditions dangerous to life or property."
We reject this argument for three reasons. First, the interruption in service occurred through the negligence of Entergy while repairs on the service facility were taking place. Without the switching error, there would not have been an interruption of power. Second, Entergy was not suspending service at the time of the event. Finally, we recognize that the contract states that Entergy "shall not be responsible for loss or damage caused by the failure or other defects of service when such failure is unavoidable or due to unforeseen difficulties or causes beyond its control." While the lightning strike was beyond Entergy's control, the switching errors were not. This assignment of error is without merit.
Turning to the tort liability, the trial court found that the fault of Murphy, Entergy, and TWC each contributed to the event and that each was a legal cause of the explosion and fire; therefore, each party was legally responsible for the resulting damages. Entergy argues that the lower court's cause-in-fact analysis was erroneous and failed to employ the substantial factor test. In addition, Entergy contends that the fault of Murphy and the defective check valve were superseding and intervening causes, thereby absolving *255 Entergy of liability.[9]
In Perkins v. Entergy Corp., 00-1372, 00-1387, 00-1440, pp. 7-10 (La.3/23/01), 782 So.2d 606, 611-13, the Supreme Court stated:
Under Louisiana jurisprudence, most negligence cases are resolved by employing a duty/risk analysis. The determination of liability under the duty/risk analysis usually requires proof of five separate elements: (1) proof that the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (2) proof that the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) proof that the defendant had a duty to conform his conduct to a specific standard (the duty element); (4) proof that the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) proof of actual damages (the damages element). Boykin v. Louisiana Transit Co., Inc., 96-1932, pp. 8-9 (La.3/4/98), 707 So.2d 1225, 1230 (citing David W. Robertson et al., Cases and Materials on Torts 83-84 (1989); Fowler v. Roberts, 556 So.2d 1 (La.1989) (on original hearing)). See also Roberts v. Benoit, 605 So.2d 1032, 1051 (La.1991). If the plaintiff fails to prove any one element by a preponderance of the evidence, the defendant is not liable. See Mathieu v. Imperial Toy Corporation, 94-0952, p. 11 (La.11/30/94), 646 So.2d 318, 326. Accordingly, because we find that the plaintiffs failed to prove the cause-in-fact element of their negligence case, there is no liability in this case.
Generally, the initial determination in the duty/risk analysis is cause-in-fact. Boykin, 707 So.2d at 1230. Cause-in-fact usually is a "but for" inquiry, which tests whether the accident would or would not have happened but for the defendant's substandard conduct. Id. Where there are concurrent causes of an accident, the proper inquiry is whether the conduct in question was a substantial factor in bringing about the accident. Id. at n. 10; Jones v. Hawkins, 98-1259, 98-1288, p. 7 (La.3/19/99), 731 So.2d 216, 220; Rick v. State, Dept. of Transp. and Development, 93-1776, 93-1784, p. 8 (La.1/14/94), 630 So.2d 1271, 1275; Dixie Drive It Yourself System v. American Beverage Co., 242 La. 471, 137 So.2d 298 (1962). To satisfy the substantial factor test, the plaintiff must prove by a preponderance of the evidence that the defendant's conduct was a substantial factor bringing about the complained of harm. Dabog v. Deris, 625 So.2d 492, 493 (La.1993).

*256 This court has made several different inquiries when applying the substantial factor test. For example, the court has stated that when there are multiple causes, clearly cause-in-fact exists when the plaintiff's harm would not have occurred absent the specific defendant's conduct. Graves v. Page, 96-2201, p. 9 (La.11/7/97), 703 So.2d 566, 570. The court has also applied the substantial factor test by asking whether each of the multiple causes played so important a role in producing the result that responsibility should be imposed upon each item of conduct, even if it cannot be said definitively that the harm would not have occurred "but for" each individual cause. See id. (citing Trahan v. State, Department of Transportation & Development, 536 So.2d 1269, 1272 (La. App. 3 Cir.1988)). See also Frank L. Maraist & Thomas C. Galligan, Louisiana Tort Law, § 4-3 at 86-88 (1996) (noting that the substantial factor test operates well in cases where there are multiple possible causes-in-fact, but the trial judge or jury may not be able to conclude that the accident most likely would not have happened but for any one of the causes). Additionally, in LeJeune v. Allstate Ins. Co., 365 So.2d 471, 475 (La.1978), the court, in describing the substantial factor test, stated that "one must consider whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm."
Whether the defendant's conduct was a substantial factor in bringing about the harm, and, thus, a cause-in-fact of the injuries, is a factual question to be determined by the factfinder. Theriot v. Lasseigne, 93-2661, p. 5 (La.7/5/94), 640 So.2d 1305, 1310 (citing Cay v. State DOTD, 93-0887 (La.1/14/94), 631 So.2d 393 (La.1994)). A court of appeal may not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong. Id. (citing Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106 (La.1990)). In order to reverse a trial court's determination of fact, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the factfinder is clearly wrong or manifestly erroneous. Stobart v. State, Through DOTD, 617 So.2d 880, 882 (La.1993). Further, on review, an appellate court must be cautious not to re-weigh the evidence or to substitute its own factual findings just because it would have decided the case differently. Ambrose v. New Orleans Police Department Ambulance Service, 93-3099 (La.7/5/94), 639 So.2d 216, 221. In sum:
[T]he reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts.

Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973); Ambrose, 639 So.2d at 224, n. 1 (Lemmon, J., concurring)
However, while deference must be given to the factfinder's determinations, *257 this court clarified in Ambrose that our purpose in Stobart was not "to mandate that the trial court's factual determinations cannot ever, or harldy [sic] ever, be upset." Ambrose, 639 So.2d at 221. Recognizing that great deference should be accorded to the factfinder, the court of appeal and this court have a constitutional duty to review facts. Id. To perform its constitutional duty properly, an appellate court must determine whether the trial court's conclusions were clearly wrong based on the evidence or clearly without evidentiary support. Id. [Emphasis in boldface added.]
Entergy argues that its serviceman's error did not create "a force or series of forces which are in continuous and active operation up to the time of the harm," within the meaning of LeJeune, 365 So.2d at 475. This is because the trial court found that the refinery was already in an "upset" condition due to the interruption in the refinery's critical utility systems as a consequence of a lightning strike that was not Entergy's fault. In addition, Entergy claims that this was not an electrical fire and the defective valve and Murphy's relighting attempts were not within Entergy's control. Further, the cause of the pentane contamination of steam was the defective mechanical check valve in the ROSE heater that allowed pentane to backflow into the steam. Therefore, Entergy asserts no relationship exists between the switching errors that caused the flame in the ROSE heater to go out, the defective valve, or the negligent relighting of the heater.
In response, Murphy points to three related and avoidable switching errors by Entergy. The first occurred after the lightning fault cleared, when an improperly designed Entergy reclosing relay (W7112) on Feeder One failed to automatically reclose that breaker. This failure shut down all the electrical loads connected to that feeder and activated under-voltage protective relays on process units, cooling water pumps, fans, and other critical utility systems. Entergy remotely closed W7112 from its Gretna dispatch center at 2:08 a.m. Meanwhile, Murphy had to put the ROSE unit on "hot stand-by"  a safe operating condition that keeps the unit warm and ready to receive process electrical feed when conditions return to normal.
The second switching error occurred later that morning when Entergy sent a repair crew to Meraux to find out why relay W7112 had not automatically reclosed after the 1:52 a.m. outage. To do this, the Entergy crew had to reroute electricity within the substation from the operating bus to the bypass bus.
Entergy's team captain, Tom Anderson, received instructions via telephone from an Entergy supervisor (Frank Miller) located at Entergy's Gretna command center. Holding a telephone receiver in his hand with its line fully extended through the front door of the control shack, Mr. Anderson shouted instructions to his subordinate, Wilbert Pappion, who stood about thirty feet away from Mr. Anderson, in front of the W7112 breaker panel door. Mr. Anderson told Mr. Pappion to close bypass breaker W7116 and bypass switch W7212 to energize the bypass bus. With the bypass bus energized to power Feeder One, the operating bus could be de-energized without interrupting the refinery's electrical service.
Mr. Pappion should have next opened breaker W7112 through the front access door. Instead, he headed around the row of switch houses to the back door where the by-pass switch was located. Mr. Anderson dropped the phone and ran after Mr. Pappion yelling for him to stop, but he was too late. Mr. Pappion opened the *258 newly activated by-pass switch W7212 instead of the de-energized breaker W7112. Electricity arced across the wrongly opened switch creating an explosion that injured Mr. Pappion, knocked out all power to Murphy's Feeder One, and caused a severe voltage dip on other feeders, including the one that served the ROSE unit. This occurred at 8:52 a.m.
The low voltage caused losses in steam pressure and triggered under-voltage relays and other automatic protective devices. These, in turn, shut down process units, most refinery motors, and the ISOPAK air compressor. Loss of the ISOPAK air compressor caused instrument air system pressure to drop below normal settings. Protective relays tripped the 480v ROSE unit switchgear main breaker that powered the ROSE unit pumps and fans, including the ROSE unit solvent (pentane) cooling/condensing fans.[10]
The third switching error identified by Murphy concerned a trip on Breaker W7113. The Supervisory Control and Data Acquisition System ("SCADA") computer records each time a breaker opens or closes and generates a SCADA report. Entergy's SCADA report for 27 July 1995 reflects the day's two earlier errors. It also shows that a SCADA operator, by mistake, remotely tripped breaker W7113 at 8:53:07 a.m. and closed it again at 8:53:21 a.m. Two other computer-generated Entergy reports further confirmed these errors. The SCADA operator's error again shut down the Murphy motors that might have tried to recover automatically from Mr. Pappion's 8:52 a.m. switching mistake. In all, about 135 more motors had to be manually started. More critical was the loss of power to Feeder Two that shut down the CENTAC air compressor  the only one still operating. Instrument air pressure then dropped even faster. As it got below 10 pounds per square inch gauge ("psig"), all refinery valves automatically moved to their designed "fail-safe" positions. All boiler fuel supply valves closed "fail safe" and that quickly dropped steam system pressure from 150 psig to about 80 psig. The "fail-safe" position for the ROSE heater's fuel gas valve was also "closed." With the fuel gas valve closed, the flame of the burner in the ROSE heater went out.
Entergy maintains that Murphy's factual account is erroneous, misleading, and inconsistent with the trial court's factual findings. We do not agree. While the trial court did not mention the reclosing relay (W7112) as a "switching error," it is the reason Entergy sent technicians to the substation. Nor did the trial court discuss the alleged trip of W7113. However, the court below found the switching error by the Entergy technicians to be significant and caused the flame on the ROSE heater to go out, thereby requiring relighting. The fact that the valve malfunctioned and Murphy employees were unreasonable and or negligent in their relighting attempts does not absolve Entergy of liability.
As stated by Mr. Eli Yagor, Murphy's electrical expert:
Q: Okay. Now, what are you trying to say in terms of causation there [in his expert report].
A: What I'm stating and  what I'm stating in simple terms is that if there were no power outages, the refinery *259 would have continued to run and there would have been no need  there would not have been process upsets and there would not have been a need to light up  light up the fire in the heater. That has nothing to do with my understanding or lack of understanding of the process  basically saying if the feeder  if the Breaker 7112 reclosed, and the loads would have ridden through the fault as they have in many previous and subsequent incidents  lightning strikes or any very short-term voltage dips in the system  and if the switching error on 7212 would not have been committed, really because of that, because of the breakers failing to reclose, as you stated yourself, because the LP & L personnel would not have been at the substation. Power would not have been lost through the process units. The refinery would have continued to run, happily and none of this  we wouldn't be here today. None of this would have happened.
We find that the trial court had sufficient evidence to find that the negligence of Entergy's employees played so important a role in producing the explosion and fire that responsibility should be imposed on Entergy, even if we cannot say definitely that the harm would not have occurred "but for" its employees actions. Perkins, supra at pp. 8-9, 782 So.2d at 612. Certainly, all three elements, namely the switching errors, the defective valve, and relighting efforts, were necessary components leading to the explosion and fire. In other words, but for the switching errors, the flame would not have been extinguished and the ROSE heater would not have needed purging and relighting. But for the valve malfunction, pentane gas would not have flowed into the steam being used to purge the ROSE heater. And, but for the relighting procedures used by Murphy employees, the fire and explosion would not have occurred. We do not find that the trial court's findings in this regard are clearly wrong or manifestly erroneous. Thus, this assignment of error is without merit.
Next, Entergy claims that the trial court failed to consider the controlling precedent of Perkins, supra. Entergy contends that the events at the Murphy refinery on 27 July 1995 were similar to events at the Air Liquide chemical plant on 6 April 1994 considered in Perkins, which involved an explosion at the plant when an automatic pressure control valve malfunctioned. Because the explosion occurred during the restart process at the plant following an electrical outage fifteen miles away, the plaintiff sued Entergy, the electrical provider. The plaintiff's theory of the case was that the shutdown produced excessive vibrations in the equipment, which loosened debris within the Air Liquide piping system, which debris moved to the valve in the let-down station and ignited the oxygen fire three hours later.
The Supreme Court affirmed the court of appeal's reversal of the judgment against Entergy, finding that other substantial factors causing the explosion precluded a finding that the utility's actions could have been a cause-in-fact of the plaintiff's damages.
The plaintiffs have not presented sufficient evidence to prove that it is more likely than not that the power disturbance was a substantial factor in the occurrence of the flash fire. There is nothing in the record showing that the malfunctioning of the automatic pressure control valve, which indisputably was a substantial factor causing the fire, was linked to the power outage. To the contrary, the evidence shows that nothing out of the ordinary was noted during startup of the facility, other than the synchronizer pack failing in the No. 3 *260 plant, until low pressure in the Exxon pipeline was discovered, some time after the shutdown occurred, as a result of the valve not closing properly. There was additional evidence that the valve had malfunctioned in the past and was known to leak on occasion. Based on the lack of evidence proving otherwise, it is possible that the valve may have malfunctioned anyway that night. Additionally, the plaintiffs' expert on valves, Mr. L. Haynes Haselmaier, testified by deposition that it was entirely possible that the slamming of the valve itself could have dislodged particulate matter, which had accumulated in the system due to the lack of proper maintenance and treatment, that could have then impinged and caused ignition.
Id. at pp. 18-19, 782 So.2d at 617-18.
In the instant case, the trial court heard testimony from Murphy's electrical expert and others linking the switching errors caused by Entergy's negligence directly to the event. Without the switching errors, the pressure differentials would have remained constant and the flame in the ROSE heater would have remained lit. The switching errors began the sequence of events that resulted in the explosion and fire. Conversely, the trial court was presented with testimony from Entergy's experts that did not link the outage to the event. Again, based on the record before us, we do not find that the trial court's conclusions are manifestly wrong or clearly erroneous. We further find that Perkins does not mandate a different result. This assignment of error is without merit.
Finally, Entergy contends that the trial court erred when awarding damages to Murphy because the award incorrectly included the amount for which Murphy settled the class action. We agree.
Prior to trial, Murphy settled the class action lawsuit for the amount of $7.3 million, after the trial court held a fairness hearing. All parties, including Entergy and ARCO, were allegedly invited to participate in the settlement and comment on the form of the judgment; Entergy and ARCO declined. In executing the settlement, Murphy reserved its right to proceed against Entergy and ARCO for any amounts they were found to owe. Murphy's insurers filed a separate lawsuit to recover the amounts they paid; we have no evidence before us that a judgment has been entered in that case.
Prior to trial, the parties stipulated that the amount of Murphy's damages was $8,549,149.00, which included $3,045,991.00, representing Murphy's uninsured losses, and $5,503,158.00, the amount paid to Murphy by its insurance underwriters. Mistakenly, the trial court found that the total damages incurred at the Murphy refinery to be $16,110,598.00, "as stipulated by the parties." It was this latter amount the trial court used to determine Entergy's 40% share of the total damages, in the sum of $3,524,392.20.
In response, while Murphy agrees that the parties did not stipulate damages of $16,110,598.00, it argues because Entergy did not appeal the judgment settling the class action suit. Thus, Murphy urges that Entergy cannot now argue that Murphy failed to introduce evidence that would establish that the claimants were damaged in that amount.
We find merit in Entergy's arguments. First, the trial court erred by including the settlement figure in the amount stipulated to by the parties as it was not. In addition, as Entergy was not a party to the judgment settling the class action, it would not have standing to appeal the judgment. In order to recover any of the monies paid to the class members, Murphy and/or its insurers would have to introduce evidence *261 to establish the appropriateness of the amount in a separate proceeding.
Therefore, we find that 40% of Entergy's share of stipulated damages is $1,218,396.40, and amend the judgment according.
Based on the foregoing we amend the judgment of the trial court to award damages in favor of Murphy and against Entergy in the amount of $1,218,396.40. In all other respects, the judgment of the trial court is affirmed.[11]
JUDGMENT AMENDED; AFFIRMED AS AMENDED.
MURRAY, J., concurs in part and dissents in part with reasons.
MURRAY, J., Concurring in Part and Dissenting in Part.
Although I agree with the majority's decision affirming the trial court's finding of no liability on the part of ARCO, I disagree with its decision affirming the trial court's finding of liability on the part of Entergy. There is no factual support for an essential element of proof of Murphy's claim against Entergy: that the power outage for which Entergy was arguably responsible was a legal cause of the plaintiffs' injuries. Entergy's duty to avoid an interruption in electrical service does not encompass the risk that a defective check valve would allow pentane gas to enter the ROSE heater undetected. Murphy's own personnel acknowledged that there was no potential for explosion had the valve operated properly. Entergy cannot legally be held responsible for unknown defects within its customer's premises. See Perkins v. Entergy Corp., 1998-2081, pp. 30-35 (La. App. 1 Cir. 12/2/99), 756 So.2d 388, 409-413, aff'd, XXXX-XXXX (La.3/23/01), 782 So.2d 606. I would thus reverse the trial court's finding of liability on the part of Entergy.
NOTES
[1] Plaintiff/Appellant/Appellee, Willie Washington, case number 2005-CA-0130, filed a brief to advise the court that he has entered into a stipulated judgment with Entergy and Atlantic Richfield ("ARCO") in the amount of $250,000. Mr. Washington, an employee of Murphy who was injured during the explosion and fire, adopts the briefs filed by Murphy as his own. Mr. Washington joins with Murphy to request that the judgment in favor of ARCO be reversed and that the percentage of fault assigned to Entergy be increased. Because the judgment of this court does neither, Mr. Washington's appeal is without merit.
[2] Electrical power to Murphy comes from Entergy's Meraux substation, located adjacent to the refinery, which Entergy designed and operates with its own equipment. Incoming electricity is collected and distributed at the substation by a single bus (conductor). The electricity is then split between a bypass bus and an operating bus. The operating bus is the one usually energized. The electricity then passes through five feeders that connect to Murphy's circuits at the substation's fence line. These five feeders power critical refinery equipment and generate other necessary utilities, particularly compressed air and steam. Murphy uses compressed air to cool water and to pneumatically operate valves that control fuel, gas, and the steam used for heating and stripping oil in towers and purging heaters before relighting. These utilities depend upon a continuous supply of electricity from the Meraux substation.
[3] Pursuant to the contract between Entergy and Murphy, Entergy is not required to notify Murphy before performing electrical work on the substation. However, the testimony at trial indicated that prior notice was customary.
[4] As we discuss below, The Walworth Company ("TWC") is not the same as the former "Walworth Company."
[5] Andry v. Murphy Oil U.S.A., Inc., unpub., 02-1666 (La.App. 4 Cir. 9/17/02), writ denied, 02-2583 (La.12/13/02), 831 So.2d 988.
[6] Andry v. Murphy Oil U.S.A., Inc., unpub., 03-0996 (La.App. 4 Cir. 6/23/03).
[7] Despite Murphy's claim of notice to Mr. Schoenfeld that all future swing check valves would be manufactured according to WAGI's design change with Walworth Company's name on them, the record fails to demonstrate that Walworth Company agreed to this arrangement. In fact, Murphy offered no direct evidence that Walworth Company ever purchased redesigned WAGI valves. However, the record reflects that valves of the new design were imported and sold by one of Walworth Company's competitors.
[8] In addition, the catalogs contained the following language:

BECAUSE OF A POLICY OF CONTINUOUS PRODUCT IMPROVEMENT, THE WALWORTH COMPANY RESERVES THE RIGHT TO CHANGE DESIGNS, MATERIALS, OR SPECIFICATIONS WITHOUT NOTICE.
[9] In 2001, Entergy filed a motion for summary judgment arguing that there was an absence of factual support for the proposition that the power outage was a legal cause of Murphy's damages. The trial court denied the motion, finding genuine issues of material fact to be resolved at trial. Entergy filed a writ application in this court seeking reversal of the trial court's judgment. A majority of the panel considering the matter granted the writ but denied relief, agreeing with the trial court. See Andry v. Murphy Oil U.S.A., Inc., unpub., 01-1881 (La.App. 4 Cir. 3/5/02). However, Judge Murray dissented and found that Entergy could not be held responsible for unknown defects within its customer's premises, citing Perkins v. Entergy Corp., 00-1372, 00-1387, 00-1440 (La.3/23/01), 782 So.2d 606. Entergy relies on Judge Murray's dissent in its appellant brief filed herein.

After considering the appellate record before us, we find that evidence exists from which the trial court could find that the power outage was a legal cause of Murphy's damages. In other words, as discussed infra, under the manifest error-clearly wrong standard of review, Murphy introduced what was necessary to establish a connection between the power outage and the subsequent explosion and fire.
[10] On 27 July 1995, the pressure differentials that are the primary safety device were lost when electrical power dips reduced Murphy's steam and air pressure for valve controls. Murphy had to manually restart electrical motors. As a direct consequence, the units that had gone down earlier were down again. Entergy's own investigation committee concluded that Entergy, through its employees, bore the responsibility for what occurred.
[11] Plaintiff/Appellee, Bryan Cassagne, case number 2005-CA-0133, was a Murphy employee injured in the explosion and fire of 27 July 1995. Following the accident, Mr. Cassagne filed suit against Entergy and TWC; later he amended his petition to assert a claim against ARCO. Mr. Cassagne's action was consolidated with the other lawsuits arising out of the explosion. At the close of the first day of the Murphy trial against Entergy and ARCO in September 2003, Mr. Cassagne, Entergy, and ARCO entered into a stipulation in open court that provided that any final finding of liability on the part of Entergy and/or ARCO would be applicable to Mr. Cassagne's action, which was to be tried at a later date.

The judgment rendered by the trial court in Murphy's action does not include Mr. Cassagne's action; nevertheless, the appeal record pleadings contain Mr. Cassagne's civil action number. We acknowledge that a final judgment has not been entered in Mr. Cassagne action against Entergy and ARCO; therefore, the judgment rendered above does not affect his pending action identified as case number 79-729, pending in the 34th Judicial District for the Parish of St. Bernard.