661 So.2d 1065 (1995)
Sharon TURNER and Viola Noble
v.
Claude PELICAN, et al.
No. 94-CA-1926.
Court of Appeal of Louisiana, Fourth Circuit.
September 15, 1995.
Writ Denied December 15, 1995.
*1066 Gordon Hackman, Boutte, for Plaintiffs/Appellants.
D. Russell Holwadel, Thomas S. Morse, Robert M. Johnston, Adams and Johnston, New Orleans, for Appellant Interstate Fire and Casualty Company.
*1067 Before BARRY, LOBRANO and PLOTKIN, JJ.
LOBRANO, Judge.
This case involves a June 24, 1988 intersectional collision in which an automobile owned and occupied by Viola Noble and driven by Sharon Turner was struck by an automobile driven by Claude Pelican and insured by United States Fidelity and Guaranty Insurance Company (USF & G). Champion Insurance Company and Interstate Fire and Casualty Insurance Company both provided uninsured/underinsured motorist coverage to Turner and Noble. When Champion instituted reorganization proceedings, the Louisiana Insurance Guaranty Association (LIGA) became the successor insurer of Champion's former insureds.
Turner and Noble originally filed suit against Pelican, USF & G and Champion. They later substituted LIGA for Champion and also added Interstate Fire and Casualty Company as a defendant. Prior to trial, Turner and Noble both settled their claims against Pelican and USF & G. Pelican and USF & G settled with Noble for $35,000.00 and with Turner for $65,000.00. LIGA settled with only Turner for $9,900.00.
LIGA filed a cross-claim against Interstate arguing that Interstate's liability precedes LIGA's liability and that LIGA is subrogated against Interstate for the amount paid by LIGA to Turner, $9,900.00.
Both Interstate and LIGA filed exceptions of res judicata to the claims of plaintiffs arguing that the releases executed by plaintiffs with USF & G bar any claims for uninsured/underinsured motorist insurance benefits. The trial memoranda in support of these exceptions argued that language in the releases evidenced the intent of the plaintiffs to release any claims for uninsured/underinsured motorist benefits under any uninsured/underinsured policy or statute.
The trial judge denied the exceptions of res judicata. Interstate filed a writ application with this court seeking review of that ruling. We denied the writ application in a published opinion. Turner v. Pelican, 625 So.2d 681 (La.App. 4th Cir.1993); writs not considered, 94-0095 (La. 3/11/94), 634 So.2d 835.
During trial, the trial judge granted a directed verdict on liability finding that Pelican's negligence was the sole cause of the accident. Following trial, the judge rendered judgment in favor of plaintiffs and against Interstate and LIGA in the following amounts:

Viola Noble:
Property Damage $ 1,479.18
Past Medical Expenses 6,118.68
Future Medical Expenses 15,000.00
Past and Future Lost Income 150,000.00
General Damages 35,000.00
 ___________
 $207,597.86
Sharon Turner:
Past Medical Expenses 6,721.31
Future Medical Expenses 25,000.00
Past and Future Lost Income 40,000.00
General Damages 45,000.00
 ___________
 $116,721.31

This judgment was later amended to correct errors in calculation due to the Interstate policy limits and to reflect the prior settlements with USF & G and LIGA. The amended judgment awarded Viola Noble $10,000.00 from LIGA and $90,000.00 from Interstate Fire and Casualty Company, plus judicial interest from date of judicial demand and taxable court costs.[1] Sharon Turner was awarded $41,821.31 from Interstate Fire and Casualty, plus judicial interest from date of judicial demand and taxable court costs.[2]
Both plaintiffs and Interstate appealed the trial court judgment. LIGA did not appeal.
Plaintiff argues:

*1068 1) Improper assignment of credits to Interstate because of USF & G's payments.
2) The trial court improperly failed to conduct a hearing on the issue of penalties and attorney fees.
3) Insufficient quantum to both plaintiffs.
4) Interstate's UM policy limits are $280,000.00, and not $90,000.00 per person.
5) Interstate improperly received a credit for the settlement by LIGA to plaintiff, Sharon Turner.
Defendant argues:
1) This court erroneously upheld the trial court's exception of res judicata in a previous writ application.
2) The awards of future medical expenses and lost income are not supported by the record.
3) Plaintiffs failed to preserve for review their complaint concerning the credit received because of LIGA's settlement.

CREDIT FOR TORTFEASOR'S PAYMENT
Plaintiffs point out that in amending the judgment, the trial judge gave a credit to Interstate for the $35,000.00 received by Noble from USF & G and for the $65,000.00 Turner received from USF & G and the $9,900.00 received from LIGA. Plaintiffs argue that the Louisiana Insurance Code and public policy support their position that instead of giving credit for the actual amount of the payment made to plaintiffs by USF & G, credit should instead be given for the amount which would have been awarded if the tortfeasor had gone to trial. Plaintiffs apparently are arguing that the allocation of the tortfeasor's policy limits to the two plaintiffs in the 1991 settlement was based on the parties' mistaken assessment of damages at that time and that the credit given to the remaining insurers should be based on the assessment of damages made by the trial judge after reviewing all of the evidence, and not the amounts actually given in settlement.[3]
LSA-C.C. art. 1803 states:
Remission of debt by the obligee in favor of one obligor, or a transaction or compromise between the obligee and one obligor, benefits the other solidary obligors in the amount of the portion of that obligor.
Surrender to one solidary obligor of the instrument evidencing the obligation gives rise to a presumption that the remission of debt was intended for the benefit of all the solidary obligors.
Citing the above article, the Fifth Circuit ruled that an excess insurer was entitled to credit for "sums previously paid" by the primary insurer. St. Hill v. Tabor, 549 So.2d 870 (La.App. 5th Cir.1989), writ denied, 556 So.2d 1262 (La.1990); see also, Futch v. Commercial Union Ins. Co., 94-2040, 2595 (La.App. 4th Cir. 4/13/95), 654 So.2d 766.
In Tully v. Liberty Mutual Fire Insurance Co., 516 So.2d 435 (La.App. 1st Cir.1987), plaintiffs settled their wrongful death and survival claims against the tortfeasor and his insurer prior to trial. The plaintiffs proceeded to trial with their claim against the uninsured/underinsured motorist insurance carrier of plaintiffs' decedent. The jury awarded $10,000.00 to the decedent's widow and $25,000.00 to each of the decedent's three major children. The First Circuit ruled that the jury awards to the three major children had to be reduced by the actual amounts they each received in the settlement with the tortfeasor's insurer.
Accordingly, we find that the trial judge in this case correctly reduced the plaintiffs' damage awards by the amounts actually paid to plaintiffs in their settlement with USF & G. This assignment of error has no merit.

PENALTIES AND ATTORNEY'S FEES
Plaintiffs argue that the trial judge did not allow them the opportunity to present evidence on the issue of their entitlement to penalties and attorney's fees because of Interstate's alleged arbitrary and capricious *1069 handling of plaintiffs' claims. They urge this Court to remand to the trial court for discovery and presentation of evidence as to this issue. We disagree.
Prior to trial, the judge denied an exception of res judicata filed by Interstate regarding the scope of the releases executed by plaintiffs with USF & G. In reasons for judgment issued with the denial of this exception, the trial judge noted that she was not yet rendering judgment on the merits of this case because she wanted to see whether or not this Court and/or the Louisiana Supreme Court granted the res judicata exception. She deemed the res judicata exception to be a "significant legal issue."
Initially we observe that the issue was, and is, significant. Standing alone it would justify Interstate's position in this matter.[4] Furthermore, the amount of damages to which plaintiffs are entitled, over and above their settlement with USF & G, was an issue of fact serious enough to justify Interstate's position. In denying plaintiffs' motion for a new trial, the trial judge implicitly rejected their claims for penalties and attorney fees. We find no error in this regard. This assignment of error is without merit.

AMOUNT OF UNINSURED/UNDERINSURED MOTORIST INSURANCE COVERAGE
Plaintiffs argue that the trial judge erred in finding that the Interstate policy limits were $90,000.00 for each plaintiff. We disagree.
Interstate's policy states that the limits of liability for uninsured/underinsured motorist coverage are $90,000.00 for each person and $280,000.00 for each accident or occurrence. Plaintiffs argue that this statement should be interpreted to mean that $280,000.00 of insurance should be available to plaintiffs, rather than a maximum of $90,000.00 for each plaintiff.
The language of the Interstate policy is clear and unambiguous. Ninety thousand dollars is the insurance available to each plaintiff for the accident which is the subject of this case. This assignment of error is without merit.

QUANTUM
Both plaintiffs and Interstate argue quantum. Plaintiffs argue that insufficient damages were awarded to them. Interstate argues that the trial court's awards to plaintiffs for future medical expenses and lost income are not supported by the evidence.
We find merit in Interstate's argument that the evidence presented did not establish that future medical expenses in the amounts awarded will be necessary and inevitable. In Dixon v. Winn-Dixie Louisiana, Inc., 93-1627, p. 23 (La.App. 4th Cir. 5/17/94) 638 So.2d 306, 322-323, this Court stated the rule for reviewing awards for future medical expenses as follows:
"When the record establishes that future medical expenses will be necessary and inevitable, the court should not reject an award of future medical expenses on the basis that the record does not provide the exact value of the necessary expenses, if the court can examine the record and determine from evidence of past medical expenses and other evidence a minimal amount that reasonable minds could not disagree will be required.
* * * * * *
Although the claimant is not required to prove the exact value of the necessary expenses, some evidence to support the award must be contained in the record."
Plaintiff Noble was awarded $15,000.00 in future medical expenses. Between the time of the accident and trial, Noble was treated by Dr. Dropadi Kewalramani, who specializes in physical medicine and rehabilitation, and by two psychiatrists, Dr. David Mitchell and Dr. Robert Barnes. Dr. Kewalramani treated Noble for headaches and neck, shoulder and back pain. Although he noted objective findings of disc protrusions and degeneration in the lumbar region, Dr. Kewalramani thought Noble's pain complaints were probably due to psychological overlay and, *1070 therefore, recommended psychiatric treatment.
In Dr. Kewalramani's testimony, he made the statement that if Noble's pain were to become unbearable, she would need surgery which would cost approximately $10,000.00. However, he stated more than once that he saw no indication that Noble would benefit from surgery and that she was not a candidate for surgery or in need of any further diagnostic testing at the time of trial.
We find that Dr. Kewalramani's testimony regarding future surgery for Noble falls short of proving that surgery will be necessary and inevitable. Although the record contains evidence, including that of past medical expenses, that support an award for other future medical treatment, we conclude that the maximum amount which can be supported by the record for such an award is $5,000.00
Plaintiff Turner was awarded $25,000.00 for future medical expenses. Turner suffered neck and back injuries in the accident and was treated for these injuries by Dr. Stuart Phillips, an orthopedic surgeon. Dr. Phillips diagnosed ruptured discs at the C5-6 level of the cervical spine and at the L5-S1 level of the lumbar spine. Dr. Phillips testified that if Turner needed surgery in the future, the cost of cervical surgery would be approximately $11,000.00 and the costs of lumbar surgery would be approximately twenty percent more than the cervical surgery or approximately $13,200.00. However, although Dr. Phillips testified that he told Turner that surgery was an option to be considered for relieving her neck pain, he stated that Turner is not a candidate for surgery. When asked if he would recommend surgery, his only reply was that it made no difference whether or not he recommended surgery because Turner did not want surgery.
We find that Dr. Phillips' testimony does not establish that future surgery will be necessary and inevitable for Turner. However, considering the more serious nature of Turner's injuries and, in particular, her past medical expenses, we find that an award of $10,000.00 for future medical expenses is appropriate.
For "past and future lost income" the trial court awarded $150,000.00 to Noble and $40,000.00 to Turner. Interstate argues that neither plaintiff should be awarded any amount for future lost income because the evidence did not establish that either suffered a residual disability related to the accident.
In reasons for judgment, the trial judge did not indicate separate amounts for past lost income and future lost income. At the time of the accident, Noble was employed as a field installer for Cox Cable. This position, which she held for seven years, required vigorous physical activity including lifting a ladder on and off a truck several times a day, driving a truck, crawling underneath houses and repeated bending and stooping. Following the June 24, 1988 accident, Noble continued working, but was initially able to avoid many of the physical requirements of the job because she was training other employees. When she had to resume the physical demands of her job, she was unable to do so because of her pain and was placed on light duty on the recommendation of Dr. Kewalramani. She remained on light duty until February 1989 when her employment was terminated.
Noble testified that she was terminated for excessive absenteeism and tardiness which was confirmed by Cox Cable personnel director Kay Robinson. Although Robinson testified that Noble's problems with tardiness and absenteeism preceded the June 1988 accident, Noble stated that her tardiness increased after the accident because the heavy doses of pain medication caused her to oversleep. Robinson confirmed that Noble's tardiness and absenteeism increased after the accident.
The trial judge concluded that Noble's loss of employment with Cox Cable and lost income are directly related to the June 24, 1988 accident. Thomas Meunier, an expert in vocational rehabilitation, concluded that Noble could not return to the type of job held at Cox Cable due to her physical limitations resulting from the accident. Meunier testified that Noble could perform more sedentary employment, but would earn only approximately *1071 half of what she earned at Cox Cable.
Dr. Richard Thompson, an economist, reviewed Meunier's evaluation and Noble's tax returns and calculated Noble's economic loss at $294,054.00. The trial judge awarded $150,000.00. Although this award appears to be on the high end of the permissible spectrum, we cannot say it is such an abuse of discretion as to warrant a reduction by this Court. Accordingly, we find no abuse of discretion with this award.
Turner was awarded $40,000.00 for past and future lost income. At the time of the accident, she was employed part-time as a housekeeper. She earned $40.00 per day and worked two to three days per week. Her work schedule has remained the same since the accident except that she had to quit one job because it required repeated stair climbing and this aggravated the pain from her injuries caused in the accident. The job that she quit was one at which she worked one day every other week. She lost another housekeeping job for reasons unrelated to the accident. Turner testified that she had to occasionally miss work due to her pain.
Thomas Meunier, the vocational rehabilitation expert mentioned above, also evaluated Turner. His opinion was that she has suffered a loss of wage earning capacity because of physical restrictions due to her injuries from the accident. He stated that Turner is not a strong candidate for formal job retraining but can perform light duty unskilled minimum wage work.
Economist Richard Thompson reviewed Meunier's report and calculated Turner's lost earning capacity at $155,218.00. The trial judge awarded less than one-third of that amount, $40,000.00. We cannot say that the trial court abused its discretion in this regard.
We find no merit in plaintiffs' argument that the general damages awarded to them were insufficient. With the exception of the awards for future medical expenses, which we have found to be excessive, the amounts awarded to plaintiffs are not so high, nor so low, as to constitute an abuse of the trial judge's discretion.
CREDIT FOR LIGA PAYMENTS
Plaintiffs argue that the trial judge erred in allowing a credit to Interstate for the $9,900.00 settlement payment made to Sharon Turner by LIGA. Plaintiffs claim that Turner's uninsured motorist coverage under the Interstate policy should be considered primary and the LIGA uninsured motorist coverage should be considered excess, thereby precluding the allowance of a credit to Interstate for amounts paid in settlement to Turner by LIGA. Plaintiffs cite Rey v. Guidry, 93-1271, 93-1401 (La. 1/14/94), 630 So.2d 714 in support of their position. This case should be cited under the name of its companion case, Segura v. Frank, 93-1271, 93-1401 (La. 1/14/94), 630 So.2d 714, cert. denied, Allstate Ins. Co. v. LIGA, ___ U.S. ___, 114 S.Ct. 2165, 128 L.Ed.2d 887 (1994).
The factual situation in the Segura/Rey case is distinguishable from that in the instant case. In Segura/Rey, the issue was whether or not there should be retroactive application of statutory amendments requiring insureds to exhaust their uninsured motorist insurers before proceeding against LIGA. In both Segura and Rey, LIGA was the successor insurer of the liability insurer of the tortfeasor. In the present case, LIGA is the successor insurer for plaintiffs' primary uninsured motorist insurance carrier, and Interstate is plaintiffs' excess uninsured motorist insurance carrier.
The case of Louisiana Insurance Guaranty Association v. Interstate Fire & Casualty Company, 93-0911 (La. 1/14/94), 630 So.2d 759, is more analogous to the situation in the instant case. Although that case involved LIGA as the primary liability insurer and Interstate as the excess liability insurer, it parallels the instant case wherein LIGA is the primary uninsured motorist carrier and Interstate is the excess uninsured motorist carrier.
LIGA v. Interstate was a declaratory judgment action on the issue of whether an excess insurer must "drop down" into the position of an insolvent primary insurer. Specifically, the question was whether Interstate's excess policy provides "drop down" coverage *1072 for policyholders insured both by Interstate as excess carrier and by Champion as primary carrier. Because the case did not involve specific claims, but was a declaratory action, a sample policy and sample declarations page were submitted by Interstate in support of its position that the policy provisions protected Interstate from having to provide drop down coverage due to Champion's insolvency.
Relying on several policy provisions, particularly the limits of liability provision, the court held that the Interstate policy plainly precluded drop down coverage. The Court ruled that Interstate was only obligated to provide coverage for a loss in excess of the limits of Champion's primary policy. LIGA v. Interstate, supra at 772.
The Interstate policy at issue in the instant case contains language identical to that cited as dispositive by the Court in LIGA v. Interstate, including the limits of liability provision. Because the relationship of LIGA and Interstate in the instant case is parallel to that in LIGA v. Interstate, supra, we find that the trial judge correctly allowed Interstate a credit for the settlement payment made to Sharon Turner by LIGA.
RES JUDICATA:
Finally, Interstate argues that this Court erred in an earlier writ disposition rendered in this case after the trial judge denied its exception of res judicata. In that previous opinion, we held that the language in the releases between plaintiffs and USF & G did not release Interstate. Turner v. Pelican, supra. Interstate argues that that prior ruling was erroneous and should be reconsidered in this appeal.
Under the "law of the case" principle, an appellate court will ordinarily not reconsider a prior ruling in the same case. That principle is discretionary. Board of Levee Commissioners v. Newport, Ltd., 578 So.2d 191 (La.App. 4th Cir.1991), writ denied, 584 So.2d 681 and 683 (La.1991); cert. denied, Newport, Ltd. v. Board of Commissioners, Orleans Levee District, 503 U.S. 970, 112 S.Ct. 1584, 118 L.Ed.2d 303 (1992). However, it has been held that where a prior disposition is clearly erroneous and will create a grave injustice, it should be reconsidered. Dodson v. Community Blood Center, 633 So.2d 252 (La.App. 1st Cir.1993), writ denied 93-3158, 93-3174 (La. 3/18/94), 634 So.2d 850, 851. In the instant case we find no such error. Although we may not agree entirely with the reasons in support of the writ disposition in this case, we nevertheless find the result correct.
It is well established that a court will not presume that a plaintiff, when settling, has waived his rights against other parties possibly liable unless it appears that he clearly intended to do so. La.C.C. Art. 3073; Migliore v. Traina, 474 So.2d 980 (La.App. 5th Cir.1985) at 983. The issue in Migliore, cited by Interstate in support of its argument, was "whether the language contained in the release clearly evidenced an intention to release [the U.M. insurer]." Id. (emphasis added). There, our brethren of the Fifth Circuit found that the release language was clear and unambiguous.
Unlike Migliore, the language in the instant case is ambiguous. The very beginning of the third paragraph acknowledges that "this is a full and final release of all claims of every nature and kind ... including any and all claims ... in tort, contract, under any uninsured motorist insurance policy or statute...." However, the last phrase of the same paragraph provides "... reserving unto the plaintiff the right to assert claims against persons or entities not so released herein." Migliore contained no such reservation. We conclude that the release before us does not show a clear intention to release Interstate, who was not a party to the settlement document, nor even a party to the litigation at the time it was executed. Nor does the release show the necessary intent by the plaintiffs to confer third party beneficiary status on Interstate as required by Civil Code Article 1978. See, Andrepont v. Acadia Drilling Co., 231 So.2d 347 (La.1969) for the requirements of a "stipulaiton pour autrui".
The previous ruling of this Court was neither manifestly erroneous nor does it create a grave injustice. Accordingly we find that disposition to be correct and reject LIGA's res judicata plea.

*1073 DECREE:

For these reasons, the trial court's amended judgment as to Viola Noble is affirmed. Even with our reduction of the amount awarded to her for future medical expenses from $15,000.00 to $5,000.00, and with the amount credited to Interstate and LIGA for the amount Noble received in her settlement with USF & G, her total damages still exceed the policy limits available to her under the Interstate and LIGA policies, $90,000.00 and $10,000.00 respectively.
The judgment in favor of Sharon Turner in the amount of $41,821.31 is amended and reduced by $15,000.00, the amount of future medicals we determine are not supported by the record. In all other respects the judgment is affirmed.
AFFIRMED AS TO VIOLA NOBLE; AMENDED AND AFFIRMED AS TO SHARON TURNER.
PLOTKIN, J., concurs with written reasons.
PLOTKIN, Judge, concurring with written reasons:
I concur in the result reached by the majority, but disagree with its statement of the law governing the "law of the case" doctrine and its application to the instant case. I also disagree with the majority's analysis of Ms. Turner's entitlement to past and future lost earnings.
"Law of the case" doctrine
The majority's general comments about the "law of the case" doctrine are correct; however, they do not go far enough. Under that doctrine, an appellate court ordinarily will not reconsider its own prior ruling on the same issue in the same case. Board of Levee Commissioners v. Newport, Ltd., 578 So.2d 191 (La.App. 4th Cir.), writ denied, 584 So.2d 681, 683 (La.1991), cert. denied, Newport, Ltd. v. Board of Commissioners, Orleans Levee District, 503 U.S. 970, 112 S.Ct. 1584, 118 L.Ed.2d 303 (1992). The reasons for the doctrine are three-fold: (1) "to avoid relitigation of the same issue," (2) "to promote consistency of result in the same litigation," and (3) "to promote efficiency and fairness to both parties by affording a single opportunity for the argument and decision of the matter at issue." Dodson v. Community Blood Center, 633 So.2d 252 (La.App. 1st Cir.1993). However, the "law of the case" doctrine is not mandatory, but is instead considered a "discretionary guide." Landry v. Aetna Insurance Co., 442 So.2d 440 (La.1983). Thus, the doctrine "has no application when an appellate court reviews a ruling of the district court or when there is palpable error in a prior ruling." Landry, 442 So.2d 440, citing La.C.C.P. art. 2164.
Accordingly, a regular appeal panel has the authority, and indeed the duty, to review, overrule, modify, and/or amend a writ panel's decision on an issue when the appeal panel finds that the writ panel's decision was in error. That of course requires that the regular panel reconsider the issue at least to the extent necessary to determine whether the writ panel's decision was correct.
There are practical reasons for this modification of the "law of the case" rule. When a issue which was previously decided on writs is raised by the parties a second time as part of the appeals process, the level of scrutiny which can be afforded is more extensive than that typically afforded by a writ panel. A regular appeal panel's review of an issue is generally much less hurried, often because it is subject to fewer immediate time constraints. Moreover, a regular appeal panel has the resources to study the issue much more fully. Often, when an issue is raised on an application for supervisory writs, the panel is required to decide the issue purely on the basis of memorandums. If a record is produced, it typically is incomplete; many times, no response is filed. All of these factors make regular appeal panel reconsideration of an issue decided by a writ panel desirable. Thus, the "law of the case" doctrine should not be automatically invoked to prevent reconsideration of an issue on appeal.
In the instant case, despite the majority's statements, the "law of the case" doctrine is not strictly applied. Although the majority does agree with the writ panel's decision, its conclusion is based on different reasoning, as revealed by the following statement: "Although *1074 we may not agree entirely with the reasons in support of the writ disposition in this case, we nevertheless find the result correct." That statement indicates that the majority did reconsider the issue at least to the extent that it was able to determine that the writ panel's ultimate disposition was not in error.
Mrs. Turner's past and future lost income
I am also concerned about the majority's imprecise statements concerning the $40,000 award for Mrs. Turner's past and future lost income. The record in this case indicates that Mrs. Turner has not experienced any actual loss of wages and that she will not experience any actual wage losses in the future. Nevertheless, under the jurisprudence, even a party who has not experienced any actual wage losses is entitled to recovery for "lost earning capacity." This term is mentioned only once in the majority opinion, in reference to the economist's calculation. Mrs. Turner is not entitled to recover for her actual past and future lost income; however, she is entitled to recovery for her lost earning capacity. Thus, I concur in the $40,000 award.
NOTES
[1] Viola Noble's total judgment of $207,597.86, reduced by the $35,000.00 settlement with USF & G, results in $172,597.00, well in excess of LIGA's $10,000.00 limit and Interstate's $90,000.00 limit.
[2] Sharon Turner's total judgment of $116,721.31, reduced by the $65,000.00 settlement with USF & G results in $51,721.00. The trial court gave Interstate credit for LIGA's $9,900.00 settlement, thus the judgment for $41,821.31.
[3] Noble received 35% of the total settlement and Turner received 65%. However, the trial court judgment is just the opposite. That is, of the total combined award, Noble received approximately 65% and Turner 35%. Plaintiffs take the position that the credits given to Interstate should be based on the actual damage award proportions.
[4] The res judicata exception is again argued by Interstate in this appeal and is addressed later in this opinion.