MOORE, J.
_JjThe defendants appeal a jury verdict and award in favor of the plaintiffs in this medical malpractice action. One plaintiff appeals her dismissal from the suit for failure to personally attend the trial. After review, we affirm the jury verdict and award, reverse the plaintiffs dismissal, and render judgment and award damages in her favor.
Facts
Linda Welch died on September 4, 1999, ten days after undergoing hip surgery at Willis-Knighton Pierremont Health Center on August 25, 1999. Two days follow *246 ing a successful hip replacement, Mrs. Welch contracted a respiratory infection after aspirating (breathing food or vomit into the lungs) the contents of a PEG tube feeding while she was in the ICU.[1] The central issue at trial was whether the staff at Willis-Knighton breached the standard of care by failing to take appropriate measures to prevent the aspiration, namely, by elevating the head of her bed at least 30 degrees during and one hour after feeding.
The plaintiffs contend that Mrs. Welch was laid down flat at some point after her PEG tube feeding at 6:00 p.m. on August 27, 1999 which caused her to aspirate the contents of her stomach. The standard of care calls for the patient’s head to be elevated at least 30 degrees during feeding and to remain elevated for one hour after feeding. In this instance, the purpose of head elevation is to prevent the dietary formula from traveling from the stomach up the esophagus to the patient’s throat where it may enter the wind-pipe and patient’s lungs. Aspirated food and caustic stomach acids will |2seriously damage the lungs and lead to infection.
Mrs. Welch had a history of aspirating prior to entering the hospital due to abnormalities in her throat and esophagus, and she suffered from chronic lung disease due to chronic aspirations. The throat abnormalities were the result of radiation therapy some years earlier to combat throat cancer. Specifically, Mrs. Welch now lacked the natural reflexive ability to block food and secretions from entering her wind-pipe. For this reason, the PEG tube was inserted directly into her stomach more than a year prior to this incident to lower the risk and severity of aspiration events, as well as to give Mrs. Welch nourishment. According to trial testimony, Mrs. Welch had not had any significant aspiration events after insertion of the PEG tube.
Following her hip surgery on August 25, 1999, Mrs. Welch was recovering well in the ICU and scheduled to be moved to the floor on August 28, 1999. The nurses’ notes show that on the evening of August 27, 1999, Mrs. Welch received a PEG tube feeding at 6:00 p.m. and tolerated the feeding well. At or near 7:00 p.m., Nurse Olivia McMorris removed Davol drain tubes from the surgery wound. At approximately 7:10 p.m., the nurses’ note entry reports that Mrs. Welch had shortness of breath and told the nurse that she could not breathe. Dr. James Smith, Mrs. Welch’s pulmonologist, was immediately contacted.
Mrs. Welch’s respiratory condition continued to worsen. When Dr. Smith arrived around 10:30 p.m., Mrs. Welch was in acute respiratory distress. With great difficulty due to her throat abnormalities, Dr. Smith performed a bronchoseopic intubation in order to insert the endotrachial line into her airways. The endotrachial line is commonly called a ventilator. Dr. |3Smith stated that he observed with the broncho-scope tremendous amounts of the liquid food in Mrs. Welch’s throat and lungs, and both bronchial trees were filled. He stated that the earlier PEG tube feeding must have come up from the stomach by regurgitation or reflux. Mrs. Welch was at greater risk because of her esophageal problems that limited her ability to contract and protect her airway; namely, the gastroesophageal sphincter which automatically protects the airway in an ordinary persons’s throat was inoperative for Mrs. *247 Welch due to the prior radiation treatments, which, in effect, left her airway wide open when she swallowed.
Mrs. Welch remained on the ventilator for five more days when, on September 2, 1999, she pulled the endotracheal tubes partially out, taking herself off the ventilator. This extubation, according to Dr. Smith, sealed her fate, since re-intubation was not possible. Mrs. Welch ultimately “coded,” and Dr. Smith performed a tra-cheostomy on September 3, 1999, but Mrs. Welch suffered brain damage and continued to decline. She died on September 4, 1999.
When Mrs. Welch aspirated on August 27, 1999, an issue arose almost immediately between the Welch family and the hospital staff over whether the aspiration resulted from Mrs. Welch being laid down. This dispute was to become the central issue at trial. As a result, prior to trial, the defense filed a motion in limine to bar testimony from decedent’s husband, Michael Welch, and the decedent’s sister, Judy Tedesco, regarding statements they allege Mrs. Welch made to them the night she was intubated. The substance of these hearsay statements was that Mrs. Welch |4told them that she had been laid down. The plaintiffs sought to offer the statements into evidence to show that the nurses breached the standard of care and this breach caused Mrs. Welch to aspirate, causing serious injury and ultimately leading to her death.
On the day of trial, the trial court granted the defendant’s motion excluding the hearsay testimony. The plaintiffs sought an emergency supervisory writ from this court seeking review of the ruling. By a 3-2 majority, a five-judge panel from this court granted the writ application and held that the hearsay testimony by Judy Tedes-co was admissible under the hearsay exception for dying declarations. La. C.E. art. 804(B)(2).[2]
At trial, Judy Tedesco testified that she spoke with her sister shortly after she had been intubated. She stated that Mrs. Welch, although intubated, asked her what happened, and when Ms. Tedesco told her she had aspirated, Mrs. Welch mouthed the words, “Damn. I told them not to lay me down.”
Mr. Welch testified that Dr. Smith told him that his wife had been laid flat. He also testified that his wife wrote him many notes before she died, among them a note stating that she had been laid down, but he had discarded the note along with many other notes she had written him.
Dr. Smith neither confirmed nor denied that he told the family or Mr. Welch that the nurses had “laid Mrs. Welch flat.” Specifically, Dr. Smith said he had no recollection of what he said to the family.
|fiThe accusation that Mrs. Welch had been laid down was raised very early on, however. The evening following the aspiration incident, Nurse McMorris, recorded a “late entry” in the nurses’ notes stating:
It was brought to my attention that spouse c/o pt being laid flat during feeding or during removal of Davol drains. Pt was fed c [with] HOB † 40°. There were 3 nurses in the room when drains were pulled. Jeff Car, Susan Smith & Debra Liegey all witness that pt’s HOB was elevated 30°. I was pt’s primary nurse on 8/27/99 from 7A to 7pm. I do not know of any other nurse entering the room & laying pt. flat.
O. McMorris, RN
The jury returned a verdict finding that the hospital breached the standard of care and awarded damages totaling $478,000. *248 The court denied the defendants’ motions for JNOV and New Trial. The defendants filed this appeal.
Also, during trial, on motion of the defendants, the court dismissed the petition of Carrie Lynn Welch for failure to appear at trial. Ms. Welch appeals this ruling.
Discussion
The defendants’ first three assignments of error concern the hearsay testimony from Michael Welch and Judy Tedesco regarding oral and written statements allegedly made by the decedent after she aspirated that she was “laid down.” The plaintiffs contended that this was a breach of the standard of care that caused Mrs. Welch to aspirate the tube feeding contents in her stomach. The statements are clearly hearsay, being statements made by someone other than the declarant while testifying at trial offered into evidence to prove the truth of the matter asserted. La. C.E. art. 801(C).
^Accordingly, prior to trial, the defendants filed a motion in limine to bar this hearsay testimony. As stated above, the trial court granted the motion, but the plaintiffs applied to this court for a supervisory writ of review. A 3-2 majority of a five-judge panel held that the statement of the decedent to her sister constituted a statement of impending death or dying declaration, and it was therefore admissible under this narrow exception to the hearsay rule. La. C.E. art. 804(B)(2). The defendants now raise the issue again on appeal, contending that the record and trial testimony show that the statements were inadmissible hearsay because they did not meet the criteria to constitute dying declarations.
Because a writ panel from this court previously ruled on the admissibility of the hearsay testimony at issue, we ordered the parties to submit briefs on the question of whether the “law of the case” doctrine applies when an issue decided in a case in a supervisory writ decision is raised again on appeal. The parties timely submitted their briefs on the issue.

Law of the Case

The law of the case principle is a discretionary guide which relates to (a) the binding force of a trial judge’s ruling during the later stages of trial, (b) the conclusive effects of appellate rulings at trial on remand, and (c) the rule that an appellate court ordinarily will not reconsider its own rulings of law on a subsequent appeal in the same case. Northeast Realty v. Jackson, 36,276 (La.App. 2 Cir. 8/14/02), 824 So.2d 1264. The majority of cases support the general rule that when an appellate court considers arguments |7made in supervisory writ applications or responses to such applications, the court’s disposition on the issue considered becomes the “law of the case,” foreclosing relitigation of that issue either in the trial court on remand or in the appellate court on a later appeal. Reed v. St. Charles General Hosp., 2008-0430 (La.App. 4 Cir. 5/6/09), 11 So.3d 1138, writ denied, 2009-1252 (La.9/18/09), 17 So.3d 979. “The doctrine also applies to previous decisions on writ applications as well as full appellate proceedings.” Roccaforte v. Nintendo of America, Inc., 05-239, p. 8 at fn.4 (La.App. 5 Cir.11/29/05), 917 So.2d 1143, 1148; see also Andry v. Murphy Oil, U.S.A., Inc., 05-0126, p. 18 (La.App. 4 Cir.6/14/06), 935 So.2d 239, 251. The reasons for the law of the case doctrine are to avoid relitigation of the same issue; to promote consistency of result in the same litigation; and to promote efficiency and fairness to both parties by affording a single opportunity for the argument and decision of the matter at issue. Louisiana Land and Exploration Co. v. Verdin, 95-2579 (La.App. 1 Cir.9/27/96), 681 So.2d 63, writ denied, 96-2629 (La.12/13/96), 692 So.2d 1067, cert. denied, *249 Verdin v. Louisiana Land and Exploration Co., 520 U.S. 1212, 117 S.Ct. 1696, 137 L.Ed.2d 822 (U.S.5/12/97).
On the other hand, the law of the case doctrine is not an inflexible doctrine. Appellate courts are not absolutely bound thereby and may exercise discretion in application of the doctrine. It should not be applied where it would accomplish an obvious injustice or where the former appellate decision is manifestly erroneous. Dodson v. Community Blood Center of Louisiana, Inc., 633 So.2d 252, 255 (La. App. 1 Cir.1993), units denied, 93-3158, 93-3174 (La.3/18/94); 634 So.2d 850, 851. Generally, reargument |sin the same case of a previously decided point will be barred where there is simply a doubt as to the correctness of the earlier ruling. Glenwood Hospital, Inc. v. Louisiana Hospital Service, Inc., 419 So.2d 1269, 1271 (La. App. 1 Cir.1982). Thus, while the law of the case doctrine is triggered upon a panel’s disposition of an issue on writ application, mechanical application of the doctrine in such cases so as to preclude any reconsideration is not appropriate.
In Turner v. Pelican, 94-1926 (La.App. 4 Cir. 9/15/95), 661 So.2d 1065, unit denied, 95-2513 (La.12/15/95), 664 So.2d 441, (J. Plotkin concurring), the concurring opinion explained the discretionary nature of the law of the case doctrine in circumstances such as the instant case:

“Law of the case” doctrine

[A] regular appeal panel has the authority, and indeed the duty, to review, overrule, modify, and/or amend a writ panel’s decision on an issue'when the appeal panel finds that the writ panel’s decision was in error. That of course requires that the regular panel reconsider the issue at least to the extent necessary to determine whether the writ panel’s decision was correct.
There are practical reasons for this modification of the “law of the case” rule. When an issue which was previously decided on writs is raised by the parties a second time as part of the appeals process, the level of scrutiny which can be afforded is more extensive than that typically afforded by a writ panel. A regular appeal panel’s review of an issue is generally much less hurried, often because it is subject to fewer immediate time constraints. Moreover, a regular appeal panel has the resources to study the issue much more fully. Often, when an issue is raised on an application for supervisory writs, the panel is required to decide the issue purely on the basis of memorandums. If a record is produced, it typically is incomplete; many times, no response is filed. All of these factors make regular appeal panel reconsideration of an issue decided by a writ panel desirable. Thus, the “law of the case” doctrine should not be automatically invoked to prevent [ ^reconsideration of an issue on appeal.
We agree with these guidelines for discretionary application of the “law of the case” rule. A regular appellate panel should reconsider the issue at least to the extent necessary to determine whether the writ panel’s decision was correct, especially where, as in this case, the emergency writ application is made during an ongoing trial and required expedited consideration. As previously stated, however, mere doubt as to the correctness of the prior ruling is not enough to change the prior ruling; only where the prior appellate ruling is manifestly erroneous or application of the law of the case rule would result in an obvious injustice should the “law of the case” rule not bar reconsideration of the matter.
The issue before this court, then, is whether the writ panel’s prior ruling was *250 manifestly erroneous or resulted in an obvious injustice. As previously noted, the panel ruled only on the hearsay testimony of Judy Tedesco, but did not rule on whether Michael Welch could testify regarding the written note he claims Mrs. Welch wrote him but he later destroyed. The record shows that the trial court and the parties received the ruling from this court while Michael Welch was testifying at trial. The trial court summoned the attorneys to the bench and reported the ruling to them. Perhaps because the court and the parties had very little time to carefully review the panel decision, however, they assumed the writ panel ruling finding that Mrs. Welch’s statement to Judy Tedesco constituted a dying declaration also extended to the hearsay testimony of Michael Welch regarding the contents of a note Mrs. Welch allegedly wrote to him. For the |inmoment, we pretermit this issue while first considering the correctness of the writ panel ruling.
Under Garza v. Delta Tau Delta Fraternity National, 2005-1508 (La.7/10/06), 948 So.2d 84, a person seeking to have declarant’s statement introduced into evidence under the “dying declaration” exception to hearsay rule must satisfy the court that (1) the declarant believed his death was imminent/impending, and (2) the declarant’s statement concerned the cause or circumstances of the impending death; a declaration, whether oral or written, that fails to meet either the timing or the content requirement of a dying declaration is inadmissible. LSA-C.E. art. 804(B). These elements constitute the foundation for allowing the hearsay testimony. A court’s decision regarding whether the declarant believed his death was imminent or impending rests on an evaluation of the declarant’s subjective experience, i.e., what the declarant believed and not necessarily what others knew about his medical condition. LSA-C.E. art. 804(B). The actual physical condition of the declarant at the time the statement was made is material and relevant insofar as it casts light on the state of mind of the declarant as to whether he believed his death was imminent or impending. The wider the disparity between the declarant’s apparent belief of his approaching doom and his actual physical condition, the less probable it is that he actually believed the end was near. Garza, supra; LSA-C.E. art. 804(B).
The first question then is whether the evidence shows that Mrs. Welch believed she was dying at the time she made the statement to Judy Tedesco that she had been laid down. Although little effort was made at [ntrial to pinpoint exactly what time Ms. Tedesco met with Mrs. Welch and made the statement at issue, the record is clear that the statement was made within a fairly short time after Dr. Smith intubated Mrs. Welch. The nurses’ notes entry that the intubation had been accomplished were recorded at 11:14 p.m. on the night of the 27th.
Ms. Tedesco testified that she arrived at the hospital around 7:30 or 8:00 p.m., on the evening Ms. Welch aspirated, which was Friday, August 27,1999. She testified that she was not allowed to see Mrs. Welch, and a nurse told her the Mrs. Welch had aspirated. Ms. Tedesco waited in the lobby until the staff told her she could visit her:
They finally came and got me and said okay you can come see your sister. When I went in there she was awake. She was intubated and she had her tube feedings going and she looked at me and she said what happened. And I said you aspirated and she said to me, [“]damn, I told them not to lay me down.[”]
Ms. Tedesco elaborated as to why Mrs. Welch’s used the word “damn.”
*251 She was angry. She was angry. She never — she was like my mother. She never ever said cuss words unless she was very angry.
Ms. Tedesco further testified that her sister could only mouth the words to her due to the ventilator tubes, but she was positive regarding what her sister told her.
Dr. Smith testified that he arrived at the hospital at approximately 10:35 p.m. Referring to his progress notes that appear to have been made contemporaneously, he stated that Mrs. Welch was in marked respiratory distress with agonal shallow respirations. Dr. Smith explained that the term |12“agonal” basically characterizes a patient’s breathing as a “last gasp” effort. “She’s labored and has very little time left when you get to that point,” he said. “She’s not going to be able to survive with that kind of respiratory effort” because the shallow respirations are not deep enough to support or move her air adequately to ventilate her. The result of this acute respiratory failure, said Dr. Smith, is respiratory acidosis or C02 narcosis, which was happening to Mrs. Welch at that time. In other words, he said, “She’s dying.”
Dr. Smith testified that after he intubat-ed Mrs. Welch, her partial pressure oxygen level in her arteries (denoted by “P02 ”) increased from 49 to 108, which, while low considering she was breathing 100% oxygen, was enough to sustain her. However, she still was having respiratory acidosis, which reflected the inability to blow off C02 gas. This causes the blood gas PH to plummet. His notes reflect that prior to placing her on the ventilator, Mrs. Welch’s blood gas PH was 7.07. After being put on the ventilator, her PH rose to 7.12. Normal is 7.4 according to Dr. Smith, and anything less than 7.25 is considered very severe acidosis. The notes also reflect that Mrs. Welch’s blood pressure .was very low, and she was given massive doses of pressors.[3]
Dr. Smith stated in his progress notes on 8/28/99 that between 3:50 a.m. and 4:40 a.m. he discussed the case at length with the family, and he had little else to offer the patient therapeutically. Finally, he wrote in his 113notes during this period that Mrs. Welch’s prognosis was “very grim at present.” At trial, he explained that “the odds were that evening probably 50/50 that she would survive that evening.”[4]
Finally, the nurses’ notes state that at 1800 hours (6:00 p.m.) Mrs. Welch received 240 cc of Ensure plus, tolerated it well, was resting quietly at this time, and there were no signs of distress. The drains were pulled at 1900 hours (7:00 p.m.) and pressure dressings applied. At 1910 hours (7:10 p.m.), obviously after Mrs. Welch aspirated, the notes state that Mrs. Welch stated: “I can’t breathe.” They further state that she was “suctioning her mouth with a yaunker.”[5] The notes state that Mrs. Welch was “alert and anxious,” but she followed commands.
*252 At 1930 hours, after Mrs. Welch’s blood oxygen pressure levels had dropped considerably, the nurses’ notes state that the patient was “very anxious” and stated: “I am having a hard time breathing.”
The objective evidence clearly indicates that Mrs. Welch was in grave danger of dying after she aspirated, and the record further shows that subjectively, she feared her death was imminent. The nurses’ notes indicated she was “very anxious” and she stated “I can’t breathe.” Dr. Smith testified that she was laboring to breathe with “last gasp” effort, and | ucould not last long in those circumstances. He testified that at that point, “she’s dying.” Few things can convey the fear of imminent death more than a feeling of suffocation.
Nevertheless, the statement allegedly made to Ms. Tedesco occurred after Mrs. Welch had been intubated and was placed on the ventilator. The evidence of her subjective belief that death was impending at this stage is less apparent from the record. However, it is clear that Mrs. Welch was still in grave danger of dying. Dr. Smith testified that she still had C02 acidosis, very low blood pressure for which she was given massive amounts of “pres-sors,” and her chances of survival were 50/50. As previously stated, the actual physical condition of the declarant at the time the statement was made is material and relevant insofar as it casts light on the state of mind of the declarant as to whether she believed her death was imminent or impending. Clearly Mrs. Welch knew she was still in grave danger since she was placed on a ventilator, which is a life support system. The only evidence of Mrs. Welch’s state of mind is the impression Mrs. Tedesco had when Mrs. Welch made the statement to her. She testified based on her knowledge of her sister that Mrs. Welch’s use of the word “damn” indicated that she was angry. We have no reason to believe that feelings of anger are inconsistent with a person’s belief that he or she is about die.
Based on this record and evidence, we conclude that the writ panel was correct in its conclusion that the statement Mrs. Welch made to Judy Tedesco met the timing and content requirement of the statute so as to constitute a dying declaration within the meaning of La. C.E. 804(B)(2). 11BMrs. Welch believed her death was imminent and the statement concerned what she believed was the cause.
By contrast, we conclude that the trial court erred in allowing the hearsay testimony of Michael Welch regarding the alleged written note from Mrs. Welch. As noted above, the opinion and ruling by the writ panel did not mention the note and the hearsay testimony of Mr. Welch. The general rule regarding trial court judgments is that when a judgment is silent with respect to a party’s claim, it is presumed that the trial court denied the relief sought. TSC, Inc. v. Bossier Parish Police Jury, 38,717 (La.App. 2 Cir. 7/14/04), 878 So.2d 880. We are unaware of any such rule regarding appellate panel judgments, but we conclude in this case that it is not necessary to extend that general rule to the writ panel decision.
The testimony regarding the timing and circumstances in which Mrs. Welch allegedly wrote the note to Mr. Welch is nebulous at best. Mr. Welch was vague regarding when the note was allegedly written, simply stating that she wrote him a lot of notes. Nor is it certain when Mr. Welch actually arrived at the hospital and met with his wife after the intubation. Dr. Smith recorded in his progress record for the time period between 3:50 a.m. and 4:40 a.m. on 8/28/99:
Family present & have discussed case @ length. Unfortunately, little else to offer patient therapeutically that may be *253 of any assistance. Will pursue PA catheter if family will consent (husband en route), (emphasis supplied).
It appears then that Mr. Welch did not see Mrs. Welch until several hours after the intubation. Although Mrs. Welch was still in grave danger at this time, we believe that her residual fear of impending death that probably | ^reached its peak during the evening of the aspiration and the difficult intubation, and for a short period thereafter, would have begun to subside. Finally, we note that Mr. Welch testified that he destroyed the notes his wife wrote him, even though it is apparent from the record that he had already accused the staff of laying Mrs. Welch flat and even though he kept notes he allegedly wrote contemporaneously regarding her care. Under these circumstances, we conclude that his testimony regarding the alleged notes should not have been permitted. Accordingly, it was error for the court to allow the hearsay testimony of Mr. Welch. Whether this error requires reversal will be discussed below.
Turning now to the remaining assignments of error, the defendants allege in their fourth and fifth assignments of error that the jury was clearly wrong in finding a breach in the standard of medical care by the Willis-Knighton nurses either during and after the PEG tube feeding or when the Davol drains were pulled. More specifically, the defendants complain that the entries in the medical record that were corroborated by the testimony of the nurses in the room at these times preclude a finding by the jury that the standard of care was breached, and that there was no admissible evidence that Mrs. Welch’s head was elevated less than 30 degrees at the time of her PEG tube feeding and for one hour thereafter.
In a medical malpractice action against a hospital, the plaintiff must prove, as in any negligence action, that the defendant owed the plaintiff a duty to protect against the risk involved, that the defendant breached that duty, that the plaintiff suffered an injury, and that the defendant’s actions 117were a substantial cause-in-fact of the injury. Gordon v. Willis Knighton Medical Center, 27,044 (La.App. 2 Cir. 6/21/95), 661 So.2d 991, writ denied, 95-2776 (La.1/26/96), 666 So.2d 679, and writ denied, 95-2783 (La.1/26/96), 666 So.2d 679. A hospital is bound to exercise the degree of care toward a patient that his or her condition requires, which must be determined under the particular facts and circumstances. Id.] Hastings v. Baton Rouge General Hospital, 498 So.2d 713 (La.1986).
A determination of whether a hospital has breached those duties depends upon the facts and circumstances of each particular case. Id.; Hunt v. Bogalusa Community Medical Center, 303 So.2d 745 (La.1974). A court of appeal may not set aside a trial court’s finding of fact in the absence of “manifest error” or unless it is “clearly wrong.” Rosell v. ESCO, 549 So.2d 840 (La.1989). Thus, to reverse a trial court, the appellate court must find from the record that a reasonable factual basis does not exist for the finding, and further that the finding is clearly wrong. Mart v. Hill, 505 So.2d 1120 (La.1987). Where there are two permissible views of the evidence, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong. Rosell, supra at 844. However, where documents or objective evidence so contradict the witness’s testimony, or the testimony is so internally inconsistent or implausible on its face that a reasonable factfinder would not credit the testimony, the court of appeal may find manifest error even where the finding is purportedly based on a credibility determination. Id. at 844-45. But where this *254 situation does not exist, and a factfinder’s determination is based on its decision to credit the testimony of 118one or two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Id. at 845.
The gist of the defendants’ argument is that there is no reasonable factual basis in the evidentiary record for the jury to conclude that the nursing staff breached the standard of care by failing to ensure that Mrs. Welch’s head was elevated at least 30 degrees. Pitting the written medical record against the alleged hearsay testimony of Judy Tedesco and Michael Welch, they argue that the latter was not only inadmissible but also implausible. The defendants conclude that a rational jury could not find the hospital liable.
The documentary or “objective” evidence regarding whether the head of Mrs. Welch’s bed was elevated during and after the 6:00 p.m. PEG feeding and removal of the Davol drains consists of entries in the nurses’ notes. There are only two entries in the nurses’ notes that refer to the head-of-bed elevation that were actually recorded on August 27, 1999. The first entry, at 0715 hours (7:15 a.m.) was made by Nurse McMorris, wherein she writes: “Rec’d c[with] HOB † 20,” indicating the head of bed was elevated 20 degrees. Nurse McMorris’s note entry written at 1800 hours when she fed Mrs. Welch via the PEG tube and at 1900 hours stating she had removed the drains and applied pressure dressings say nothing more about the head of bed being elevated greater than 20 degrees, nor do any of her other note entries that day state that she lowered the head of the bed. The very next entry, written at 1910 hours by a nurse of the next shift, apparently D. Adkins, R.N., read:
| ^Pt. HOB t, c/o SOB and states “I can’t breath[,”] drainage noted @ stoma site light brown in color....
which translated means, “Patient head of bed elevated, complains of shortness of breath and states “I can’t breathe....” Assuming that this entry reports merely what Nurse Adkins observed, and not that she herself elevated the head of the bed, the entry does not indicate that the elevation of the head of the bed is more or less than the 20 degrees of the 0715 entry.
During the night or early morning hours following the aspiration, Michael Welch accused the nurses of laying Mrs. Welch flat and thereby caused her to aspirate. Mr. Welch testified at trial that it was Dr. Smith who told him that the nurses had laid Mrs. Welch flat and caused her to aspirate, although Dr. Smith testified that he had no recollection of what was said in his conversation with the family that evening. However, as a result of these accusations, Nurse McMorris wrote the following “late entry” into the nurses’ notes the next evening at 1115 hours on 8/28/99.
It was brought to my attention that spouse c/o pt being laid flat during feeding or during removal of Davol drains. Pt was fed c [with] HOB f 40°. There were 3 nurses in the room when drains were pulled. Jeff Car, Susan Smith & Debra Liegey all witness that pt’s HOB was elevated 30°. I was pt’s primary nurse on 8/27/99 from 7A to 7pm. I do not know of any other nurse entering the room & laying pt. flat.
O. McMorris, RN
The story told in this late entry was only partially corroborated at trial. Deborah Liegey testified that she assisted Nurse McMorris roll Mrs. Welch over and tip her hip so that her drains could be pulled. She recalled that she left the room before Nurse McMorris changed the dressings. She stated that the bed was semi-reclined *255 up about one foot, which she estimated 12pwas 30 degrees or more. Jeff Carr testified that he stuck his head head in the door of the room when he was leaving his shift a few minutes after 7:00 p.m. He said Nurse McMorris was in the room alone on the left side of Mrs. Welch. He asked Nurse McMorris if she needed any help and she declined. He said he observed the already-pulled drains on the bed and Mrs. Welch was looking to her left either watching television or speaking with Nurse McMorris. He testified that the head of the bed was elevated at least 30 degrees. He said that Deborah Liegey was with him and Susan Smith was a few steps behind them.
Although Dr. Smith ultimately testified that he did not believe that the nurses breached the standard of medical care at any time in their care of Mrs. Welch, his testimony could have been seen as somewhat equivocal by the jury. For example, Dr. Smith did not testify that he did not tell Michael Welch that the nurses had laid Mrs. Welch flat. He simply said he did not recall what he might have said during the conversation. The jury could have interpreted his testimony as an attempt to shield the hospital or the nurses.
Additionally, two of the plaintiffs experts, Dr. Myron Jacobs and Joanne Gon-gora, R.N. expressed their opinion that Mrs. Welch had been laid flat. Dr. Jacobs opined that the medical events in the record indicated that Mrs. Welch had been laid flat during or too soon after the 6:00 p.m. PEG tube feeding. He testified that this caused Mrs. Welch to aspirate, and this aspiration and the complications that arose therefrom caused Mrs. Welch’s death. Nurse Gongora testified as to the meaning of the entries in the nurses’ notes, anesthesia record, progress notes, etc. Importantly, Nurse |2iGongora explains that the time entries in the notes do not generally reflect exactly when an action is taken, but are usually entered afterwards. Based on these entries, she opined that Mrs. Welch had been laid flat when the drains were pulled recorded in the 7:00 p.m. entry by Nurse McMorris, and this caused Mrs. Welch to aspirate, evidenced by the 7:10 p.m. entry.
Finally, there is the testimony of Judy Tedesco, who stated that she was allowed to see Mrs. Welch after she was intubated, and Mrs. Welch told her that she had been laid flat. The defendants attack this testimony not only on grounds that it is hearsay, but that it is not credible under the circumstances. First, they argue that a person intubated is physically unable to speak, and second, the plaintiffs are motivated by their financial interest in the outcome of the case. Be that as it may, it is the province of the jury to determine the credibility of a witness and to decide what weight to give testimony.
Accordingly, after review, we conclude that the objective medical record is not so conclusively contradictory to the jury verdict as the defendants argue. At best, the contemporaneously made nurse note entries show that the head of the bed was not raised or lowered from the initial 20 degree elevation some 11 hours earlier, which is still 10 degrees lower than the 30 degrees called for by the standard of care. Next, the “late entry” is internally inconsistent, stating on the one hand that the head of the bed was elevated 40 degrees when Mrs. Welch received the 1800 feeding and at the 1900 dressing change, but then records that there were three nurses in the room when the drains were pulled and all witnessed that the bed was ^elevated 30 degrees. The testimony of these witnesses indicates that they were not actually in the room when the drains were pulled. Deborah Liegy said she was only present to help turn Mrs. Welch on *256 her side, and Jeff Carr testified that he only stuck his head in the room and observed the already-removed drains on the bed when he asked Nurse McMorris if she needed assistance. Although both of these nurses testified that the head of the bed was elevated, the jury could have concluded that they were trying to protect their coworker.
For these reasons, we cannot say that the jury was clearly wrong in finding that Willis-Knighton or the nurses breached the standard of care by failing to elevate the head of Mrs. Welch’s bed 30 degrees during and after the tube feeding or removal of the Davol lines. These assignments are without merit.
For the same reasons, we conclude that the defendants’ final assignment of error is without merit. By this assignment, the defendants contend that the trial court erred in denying Willis-Knightoris motion for JNOV or, alternatively, a New Trial, because a reasonable jury could not have concluded based on the corroborated evidence and testimony that the hospital breached the standard of care.
A JNOV is warranted only when the facts and inferences, viewed in the light most favorable to the party opposing the motion, is so strongly and overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict; the motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable | ^men could not reach a different conclusion, not merely when there is a preponderance of the evidence for the mover. Peterson v. Gibraltar Savings and Loan, 1998-1601 (La.5/18/99), 733 So.2d 1198.
In denying the defendants’ motions for JNOV and New Trial, the trial court stated that it believed that a jury untrained in the law and the Code of Evidence would have great difficulty giving the statement of Judy Tedesco the appropriate weight and consideration. The trial court went on to say that if the hearsay statement had been excluded he might have come to a different conclusion on the motions. The trial court conceded, however, that if the evidence of the dying declaration testimony is valid, “I have to conclude that the jury verdict is correct.”
We have previously ruled that the statement to which Judy Tedesco testified constituted a valid dying declaration; however, we also ruled above that the hearsay testimony of Michael Welch was not admissible as a dying declaration.
The effect of an erroneous evi-dentiary ruling is that “[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of a party is affected.” La. C.E. art. 103. The admission of hearsay testimony is subject to the harmless error analysis. Finch v. ATC/Vancom Management Services Ltd. Partnership, 09-483 (La.App. 5 Cir. 1/26/10), 33 So.3d 215; Brooks v. Southern University and Agricultural and Mechanical College, 2003-0231, p. 11 (La.App. 4 Cir. 7/14/04), 877 So.2d 1194, 1203, writ denied, 2004-2246 (La.11/19/04), 888 So.2d 208. Moreover, where evidence is admitted that is merely | ^cumulative of other evidence in the record, any error in its admission is harmless. See, e.g., Everhardt v. Louisiana Dept. of Transp. and Development, 2007-0981 (La.App. 4 Cir. 2/20/08), 978 So.2d 1036, 1048.
In this instance, the testimony of Mr. Welch regarding the note she allegedly wrote him concerning her being laid down was cumulative. We conclude, therefore, that the erroneous admission of Mr. Welch’s testimony was harmless error.
*257 Accordingly, this assignment is without merit.

Dismissal of Carrie Lynne Welch

At the conclusion of the plaintiffs’ case, the defense moved to dismiss the plaintiff Carrie Lynne Welch pursuant to La. C.C.P. art. 1672(A) because Carrie Lynne did not personally appear at trial. This dismissal is clearly an error of law.
La. C.C.P. art. 1672(A)(1) states:
A judgment dismissing an action shall be rendered upon application of any party, when the plaintiff fails to appear on the day set for trial. In such case, the court shall determine whether the judgment of dismissal shall be with or without prejudice.
In this case, although Carrie Lynne Welch did not personally appear at trial, her attorney was present and tried the case. It is well-settled that an appearance by a party for trial may be either personal or through his counsel of record. Jackson v. City of Westlake, 2003-782 (La.App. 3 Cir.2/10/03), 861 So.2d 771; Berger v. Johnson, 141 So.2d 164 (La.App. 4 Cir.1962). Accordingly, the trial court erred as a matter of law by dismissing Carrie Lynne Welch.
1 iaThe record also shows that the jury attempted to award Carrie Lynne Welch damages but were prohibited by the trial court due to the dismissal. At trial Stephanie Welch and Mr. Welch testified that Carrie and her mother had a special relationship that arose out of Mrs. Welch being advised to abort Carrie during Mrs. Welch’s pregnancy. Mrs. Welch was undergoing treatment for lymphoma and doctors were fearful that the baby would not be normal due to the medical treatment Mrs. Welch was undergoing. Nevertheless, Mrs. Welch refused to abort the child and thereafter she was always very protective of Carrie. Mr. Welch testified that Carrie could not come to the trial because she was still emotionally distraught over her mother’s death.
We therefore render judgment in favor of Carrie Lynne Welch and award her damages in the amount of $100,000 for the wrongful death of Linda Welch.
Conclusion
For the reasons stated above, we affirm the judgment of the trial court in the plaintiffs’ favor and against Willis-Knigh-ton Medical Center and the Patients Compensation Fund. We reverse the judgment of the trial cpurt dismissing the plaintiff Carrie Lynne Welch, and we award damages in the amount of $100,000 in her favor.
AFFIRMED IN PART; REVERSED IN PART; JUDGMENT RENDERED.

. PEG is the acronym for a percutaneous endoscopic gastrostomy tube inserted by a surgical incision into the stomach, so that liquid feeding can be accomplished for nourishment.

. We note that the panel did not rule regarding the hearsay testimony of Mr. Welch.

. Pressor drugs are used to treat hypotension resulting from cardiogenic shock, circulatory shock (including septic), hemorrhagic shock, and hypotension that sometimes occurs during surgical anesthesia.

. Over the next five days, Mrs. Welch’s condition remained very serious. She continued to suffer from acute respiratory distress, low blood pressure, septic shock. Her daily prognosis (predicted outcome) only improved from "grim” to "poor” to "guarded.” In other words, Mrs. Welch remained in grave danger of dying.

.A Yankauer suction device. Developed circa 1907 by Dr. Charles Yankauer, the Yan-kauer Suction Instrument has become the most common suction instrument in the world. It’s primary use is to aspirate fluid and debris from either a surgical site or body orifice (e.g. airway).